SOUTHERN RAILWAY COMPANY; Cincinnati, New Orleans & Texas Pacific Railway Company; Louisville & Nashville Railroad Company; Clinchfield Railroad Company; and Missouri, Pacific Railroad Company, Appellees,

v.

STATE BOARD OF EQUALIZATION of the State of Tennessee; Lamar Alexander, Chairman; Gentry Crowell, Vice Chairman; William R. Snodgrass; Harlan Mathews; John E. Sloan, Jr.; Martha Olsen; Claude Ramsey; and William C. Koch, Jr., Members of the State Board of Equalization of the State of Tennessee, Appellants.

Supreme Court of Tennessee,
at Nashville.

Dec. 10, 1984.

Jim G. Creecy, Deputy Atty. Gen., W.J. Michael Cody, Atty. Gen. and Reporter, Nashville, for appellants.

Everett B. Gibson, Memphis, William C. Antoine, Washington, D.C., Marion F. White, Laughlin, Halle, Clark, Gibson & McBride, J. Richard Buchignani, Wildman, Harrold, Allen, Dixon & McDonnell, Memphis, Tyree B. Harris, Dodson, Harris, Robinson & Aden, Nashville, Courtney George, Seaboard System Railroad, Jacksonville, Fla., Henry C. Wolf, Norfolk Southern Corp., Roanoke, Va., for appellees.

OPINION

COOPER, Chief Justice.

This case involves a dispute between five railroads and the State Board of Equalization (Board) concerning the valuation of railroad property for ad valorem tax purposes in 1981. On an appeal of the value placed by the Board on railroad property for ad valorem taxation, the Chancery Court of Davidson County concluded that neither the Board's treatment of accumulated deferred income taxes nor the Board's valuation of the cost of equity were supported by substantial and material evidence, but such evidence did support the Board's application of the imbedded debt concept. The Court of Appeals affirmed. On the two issues before this court, we affirm the holding that accumulated deferred income taxes are not a cost-free source of capital, but we find substantial and material evidence supporting the Board's valuation of the cost of equity.

The railroad companies here are interstate carriers subject to ad valorem taxation pursuant to T.C.A. § 67-901 (now § 67-5-1301) which authorizes and directs the Tennessee Public Service Commission (Commission) to assess for taxation "all of the properties of every description, tangible and intangible, within the state, owned by and all personal property used and/or leased by" various companies, including railroads. The State Board of Equalization is authorized to review the Commission's assessments, and may increase or diminish the valuations. T.C.A. § 67-932 (now § 67-5-1328). The Board's valuations are then certified to the Commission as conclusive and final, but the assessed taxes may be paid under protest and court review may be sought. T.C.A. § 67-933 (now § 67-5-1329). Review is pursuant to the Uniform Administrative Procedures Act, T.C.A. § 4-5-101 *et seq.*, and is conducted without a jury and confined to the record if no procedural irregularities are alleged. T.C.A. § 4-5-117(g) (now § 4-5-322(g)). Reversal or modification of the agency's order is allowed, in one instance, when the reviewing court finds that the administrative decision is not supported by substantial and material evidence in light of the entire record. T.C.A. § 4-5-117(h)(5) (now § 4-5-322(h)(5)).

On July 27, 1981, the Commission notified all public utility and transportation companies in Tennessee of the value of their properties subject to ad valorem taxation and the amount of tax. The values set by the Commission were:

| RAILROAD | SYSTEM VALUE | ASSESSED VALUE IN TN |
|---|---|---|
| Cincinnati, New Orleans & Texas Pacific | 215,000,000 | 36,120,000 |
| Clinchfield | 165,000,000 | 13,852,000 |
| Louisville & Nashville | 820,000,000 | 68,723,000 |
| Missouri, Pacific | 1,625,000,000 | 2,675,000 |
| Southern | 1,100,000,000 | 57,484,000 |

The Commission determined the valuation of the properties through application of the unit rule of appraisal, which is defined as "the appraisal of the property as a whole without geographical or functional division of the whole." T.C.A. § 67–902 (now § 67–5–1302(a)(3)). The "unit" refers to all operating property, tangible and intangible, owned and used and/or leased by the company as determined by the Commission. T.C.A. § 67–902 (now § 67–5–1302(a)(4)). This method of appraisal employs three recognized indicators of value to determine the value of an entire railroad: the cost approach, the stock and debt approach, and the income approach. The Commission determined a value for each approach and correlated them to arrive at one valuation, but gave the most weight to the income approach.

The railroads appealed their respective assessments to the Commission, protesting the techniques used by the Commission's staff in valuing the property under the unit rule. They argued that the system values exceeded the market value of their railroads, and suggested these values:

| RAILROAD | SYSTEM VALUE |
| --- | --- |
| Cincinnati, New Orleans & Texas Pacific | 162,734,000 |
| Clinchfield | 102,957 |
| Louisville & Nashville | 561,074,000 |
| Missouri, Pacific | 971,942,000 |
| Southern | 695,516,000 |

After a hearing on these complaints, the Commission entered an order fixing the system values as had been previously determined. The railroads appealed the assessments to the Board, which considered written appraisal reports, affidavits, critiques of the appraisals submitted by the parties, and the testimony of an expert witness for the railroads and two for the Commission. The Board issued an order upholding the Commission's valuations. Judicial review was then sought.

As heretofore noted, in determining the full system value of the railroads, the Commission and the Board considered each of the three methods of appraising property under the unit rule of appraisal. The income approach was determined by them to be the most reliable method and they assigned the greatest weight to it in arriving at their valuation.

In the income approach the appraiser attempts to determine the value an investor would currently pay to receive the projected future income of the railroad. The accepted measure of a railroad's system income is its Net Railway Operating Income (NROI), which is the income from operations after depreciation and taxes, but before any distribution to the railroad's security holders. Once an estimate is made of the projected NROI (the anticipated future income stream), the fair market value of the railroad is determined by dividing the projected income by the capitalization rate. The capitalization rate is an estimate of the return an investor would demand as an inducement to invest in the purchase of property which generates the railroad's system income.

Three methods are available for developing the capitalization rate: the summation method, the comparative method, and the band of investment method. The most accepted approach is the band of investment method, and it was applied by the Commission and the Board in valuing the railroads' properties. Under this method the capital structure of the railroad is broken down into two "bands": debt and equity. Each "band" is assigned its own capitalization rate, these rates are then weighted, and a final estimate of the capitalization rate is determined. Each railroad is unique and it is impossible to derive one standard rate of capitalization due to differences in risk, capital structure, and cost of debt.

In its valuation of the railroad properties, the Commission included the accumulated portion of deferred federal income taxes as a cost-free source of capital in developing the capitalization rate. The accumulated deferred taxes were treated as another "band of investment" at the rate of 0%, causing an adjustment in the overall capitalization rate. The Commission noted that

the deferred taxes reduce the company's tax bill and thereby increase the NROI and the Commission has consistently held

that the company's appraised value should reflect these tax benefits. Deferred taxes result from a timing difference which occurs when the railroad uses accelerated depreciation of equipment for income tax purposes and thereby lowers current tax expense and increases NROI.

The Board affirmed this procedure by concluding that "deferred income taxes may be properly accounted for in the Income Approach to value by adjustment of the capital structure ... to include accumulated deferred taxes as interest-free capital ...." The Court of Appeals agreed with the chancellor that no substantial and material evidence supported that conclusion, and quoted the chancellor's memorandum:

[t]he problem with the method used by the Board is that deferred federal income taxes are not a cost-free source of capital; they are not a source of new capital at all. While it is true that being able to defer paying taxes allows the railroad to use the capital it generated through income, the value of that capital is already reflected in the projected future income stream.

■ In reviewing an administrative decision, a court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." T.C.A. § 4–5–322(h)(5). Factual issues are reviewed upon a standard of substantial and material evidence, and not upon a broad, de novo review. *CF Industries v. Tennessee Public Service Commission*, 599 S.W.2d 536, 540 (Tenn.1980). Substantial and material evidence is " 'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.' " *Sweet v. State Tech. Institute at Memphis*, 617 S.W.2d 158, 161 (Tenn.App. 1981) (quoting *Pace v. Garbage Disposal District of Washington County*, 54 Tenn. App. 263, 390 S.W.2d 461, 463 (1965)). A court will not disturb a reasonable decision of an agency with expertise, experience, and knowledge in the appropriate field.

*Griffin v. State*, 595 S.W.2d 96, 99 (Tenn. Crim.App.1980).

■ On considering the record under this standard of review, we agree with the conclusion of the Court of Appeals that there is no substantial or material evidence to support the Board's inclusion of accumulated deferred income taxes as a separate band of investment in the cost of capital. To the contrary, the evidence shows that the full value attributable to the deferred taxes is reflected in the income stream and that it would be duplicative also to consider them as a separate component of capital structure.

On the second issue before this court, the Court of Appeals affirmed the chancellor's holding that there is no material and substantial evidence in the record to support the Board's finding that rates of return of 16.5% for the L & N Railroad and 15.5% for the other railroads are adequate and proper for the equity component of the capitalization rate. The Court of Appeals quoted the chancellor in approving the railroads' valuation of a cost of equity in excess of 20%:

In summary, the PSC report upon which the Board based its finding of the cost of equity does not really constitute evidence at all; it is merely a series of unsupported conclusions. The Railroads on the other hand offered expert testimony which explained in considerable detail the data used and how that data supported the conclusions.

Unfortunately, the cost of equity cannot be ascertained with certainty, since most railroads are privately held. The ultimate question in developing a cost of equity capitalization rate is: What current rate of return would be necessary to attract investors in the equity of railroads? Of necessity, an appraiser attempting to answer this question must exercise an informed judgment. But, that judgment must be based upon established facts.

■ It is true that the testimony of the railroads' experts was more comprehensive and thorough than that of the Commission's experts, but this goes only to the

weight of the evidence. The chancellor noted that the Commission's *1981 Appraisal of Railroads in Tennessee* referred to studies made of the price-earnings ratio of the railroad industry, airline industry, gas industry, telephone industry, and others, but that neither figures nor explanations of how they related to the Commission's conclusions were in the record. Six pages of the appraisal report discussed the techniques used in developing a capitalization rate under the band of investment method, although the cost of equity was only discussed on one page. The appendix to the report contained profitability and growth comparisons for the air transportation industry, the surface transportation industry, electric utilities, telecommunications, the natural gas industry, the energy industry, multi-industry corporations, conglomerates, railroads, public utilities, and public service corporations. Also included were records of sales and profits for railroads and utilities, and profitability and price-earnings ratios for a dozen railroads. In addition, there was data on the yields of U.S. Treasury Bonds and Notes, and on the weighted average of yield on newly issued domestic bonds. The Commission's appraisal clearly explains the steps that were taken and the general types of data that were examined in determining the rate of equity. The only difference from the data supplied by the railroads is a matter of specificity. The appraisal report stated the factors that were considered, but did not attempt to show an exact formulation or computation as did the railroad. However, there is no definitive procedure for determining an equity rate, for the rate of return varies with every company. It is, as the Board of Equalization noted, "probably the most subjective task the appraiser faces."

The judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded for the recalculation of the full system values of the several railroads using the applicable cost of equity determined by the Board, using the embedded cost of debt, and computing the capitalization rate without including deferred federal income taxes as a component of the band of investment. Costs incident to the appeal will be paid one-half by the Board and one-half by the railroads.

FONES, BROCK, HARBISON and DROWOTA, JJ., concur.