# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT JACKSON

| | | |
|---|---|---|
| **MATTIE BEDFORD,** | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Shelby Equity No. 1048022-1 |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **MARGARET CULPEPPER,** | ) | Appeal No. 02A01-9604-CH-00085 |
| **Commissioner of the Tennessee** | ) | |
| **Department of Employment Security,** | ) | |
| **and METHODIST HOSPITAL,** | ) | |
| | ) | |
| Defendants/Appellees | ) | |

**FILED**

**June 20, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

### APPEAL FROM THE CHANCERY COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE

### THE HONORABLE NEAL SMALL, CHANCELLOR

For the Plaintiff/Appellant:

Florence M. Johnson
Memphis, Tennessee

For the Defendant/Appellee,
Margaret C. Culpepper, Commissioner of The
Tennessee Department of Employment Security:

Charles W. Burson
Robert W. Stack
Jennifer H. Small
Nashville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCUR:

W. FRANK CRAWFORD, P.J., W.S.

ALAN E. HIGHERS, J.

**OPINION**

This is an unemployment benefits case. The Tennessee Department of Employment Security ("TDES") denied the application of Appellant Mattie D. Bedford ("Bedford") for unemployment benefits on the basis of several instances of employee misconduct and ordered the repayment of previously paid benefits totaling $1,100. After administrative appeals, the Chancery Court affirmed the denial of benefits and the repayment order. We affirm the decision of the Chancery Court.

Bedford worked as a respiratory therapist at Methodist Central Hospital ("Methodist") in Memphis, Tennessee, from 1981 until the termination of her employment in March 1994. She was assigned to Methodist's hyperbaric oxygen unit. Treatment in the hyperbaric unit involves placing the patient in a chamber which is then filled with 100% oxygen under high atmospheric pressure. The potential fire hazard in such an environment is extremely high. The slightest spark could touch off a fire which would incinerate the patient and very likely destroy part of the hospital. Consequently, patients entering the hyperbaric chamber must minimize the danger of fire hazard. To reduce the risk of fire, patients entering the hyperbaric chamber are forbidden to wear makeup, hair spray, and fingernail polish because some types of these products can be highly flammable in the oxygen-rich, highly pressurized environment of the hyperbaric chamber. Bedford's responsibilities included seeing that patients were properly prepared for entry into the chamber for treatment. Methodist's written policies regarding the preparation of patients for the hyperbaric chamber proscribed patients wearing makeup and fingernail polish from the chamber. In addition, every therapist was required to go through written guidelines with each patient every time treatment was administered in the hyperbaric unit. The guidelines included the removal of makeup and fingernail polish.

Bedford was aware of Methodist's procedures and was aware of the guidelines requiring the removal of makeup and fingernail polish. She had had twelve years of experience and had gone through several training courses related to working with a hyperbaric unit. It was Bedford's understanding that water-based makeup posed no threat of fire in the chamber. It was also her understanding that the vapors from an alcohol swab used to remove fingernail polish could constitute a bigger hazard than allowing the patient to keep the polish on, especially if the fingernail polish had not been recently applied. However, Methodist's procedures flatly required the removal of all makeup and fingernail polish, with no exceptions.

On March 16, 1994, Bedford allowed a female patient to enter the hyperbaric chamber

wearing both makeup and fingernail polish. While the patient was in the chamber, the second-shift supervisor, Laquita Rallings ("Rallings"), entered the room and noticed the patient with makeup and polish on. Rallings testified that she told Bedford never to let a patient go into the chamber again wearing makeup and polish. Bedford denied that Rallings told her this. According to Bedford, Rallings told her that the patient was mad at Rallings for previously warning the patient not to wear makeup into the chamber, and that Rallings then turned to another therapist and said that they all should start telling patients the same thing.

On the same day, Rallings saw Bedford with another patient, Mr. Hill. Mr. Hill was finished with his therapy and waiting in a wheelchair to be taken back to his room. In Mr. Hill's presence, Bedford told an orderly to "push Mr. Hill down the elevator shaft." Rallings considered this to be an inappropriate comment but did not want to correct Bedford in front of another therapist who was present.

The next day, while Bedford was on duty, Rallings discovered the same female patient as on the previous day, once again in the hyperbaric chamber wearing makeup and polish. Rallings confronted Bedford, who responded by telling Rallings that she did not know as much about the hyperbaric chamber as did Bedford, and that she, Bedford, had been told that some types of makeup could be worn into the chamber. Rallings told Bedford that her action constituted insubordination because Bedford disregarded Rallings' direct order given only the day before.

Rallings also confronted Bedford with the comment Rallings overheard Bedford make about pushing a patient, Mr. Hill, "down the elevator shaft." Bedford said that the comment was a joke and that Mr. Hill had understood that because she often joked with him. Rallings insisted that the comment was inappropriate and that it could have been damaging to Methodist had it been overheard by a passerby. The comment was especially egregious in light of Methodist's recent efforts to polish its public image.

Under Methodist's disciplinary policies, an employee may be discharged upon the third disciplinary infraction committed within two years. Prior to the above incidents, Bedford had committed her third infraction, but had been suspended without pay instead of being discharged. Her inappropriate comment and her disregard of the requirements for patients entering the hyperbaric

2

chamber were her fourth and fifth infractions within a two-year period.[1]  As a result, Rallings

suspended Bedford and asked her to return the next day to speak with the Director, Douglas Stover.

When Bedford returned  on the 18th, Stover informed her that her employment was being

terminated.

The following month, Bedford applied with TDES for unemployment benefits.  TDES

initially approved the claim, based on Bedford's application.  Methodist appealed, arguing that

Bedford was ineligible to receive benefits because she had been terminated for misconduct.  A

hearing was held, and TDES heard testimony from Bedford, Rallings, and Tommy Mangrum, the

first-shift supervisor.  After the hearing, TDES ruled in Methodist's favor, reversing the award of

benefits and ordering Bedford to pay back $1,100 in benefits already paid out to her.  Bedford

appealed, and both the TDES Board of Review and  the Chancery Court affirmed the decision in

favor of Methodist.  Bedford now appeals to this Court.

On appeal, Bedford argues that she did not commit misconduct sufficient to disqualify her

from receiving unemployment benefits.  Even if this Court affirms her disqualification for benefits,

Bedford  contends that the order to repay $1,100 in benefits was arbitrary and capricious and should

be reversed.

The standard of review to be applied by the chancery court is set out in Tennessee Code

Annotated § 50-7-304, which provides in pertinent part:

> (2)  The chancellor may affirm the decision of the board or the chancellor
> may reverse, remand or modify the decision if the rights of the petitioner have been
> prejudiced because the administrative findings, inferences, conclusions or decisions
> are:
> (A)  In violation of constitutional or statutory provisions;
> (B)  In excess of the statutory authority of the agency;
> (C)  Made upon unlawful procedure;
> (D)  Arbitrary or capricious or characterized by abuse of discretion or clearly
> unwarranted exercise of discretion; or
> (E)  Unsupported by evidence which is both substantial and material in the
> light of the entire record.

Tenn. Code Ann. § 50-7-304(I)(2) (Supp. 1996).  The statute further provides:

> (3)  In determining the substantiality of evidence, the chancellor shall take
> into account whatever in the record fairly detracts from its weight, but the chancellor
> shall not substitute the chancellor's judgment for that of the board of review as to the
> weight of the evidence on questions of fact.  No decision of the board shall be
> reversed, remanded or modified by the chancellor unless for errors which affect the

---

[1]Bedford's previous infractions, as found by TDES, were for "inappropriate behavior and
excessive unauthorized call time."

3

merits of the final decision of the board.

*Id.* § 50-7-304(I)(3) (Supp. 1996). The same standards of review used by the chancery court apply to this Court. *Armstrong v. Neel*, 725 S.W.2d 953, 955 & n.1 (Tenn. App. 1986). In sum, this Court reviews "the entire record, including any proof that fairly detracts from the agency's decision, to determine whether it is arbitrary, capricious, characterized by an abuse of discretion, or unsupported by substantial and material evidence." *Id.* at 955.

Bedford first argues that the record does not contain substantial and material evidence to support the finding that she committed misconduct which would warrant a denial of unemployment benefits. The statute does not define "substantial and material evidence." However, in *Southern Railway Co. v. State Board of Equalization*, 682 S.W.2d 196, 199 (Tenn. 1984), the Tennessee Supreme Court stated that evidence is substantial and material if it is relevant, if a reasonable mind would accept it as support for a rational conclusion, and if it provides a reasonably sound basis for the action being considered. *See Ogrodowczyk v. Tennessee Bd. for Licensing Health Care Facilities*, 886 S.W.2d 246, 251 (Tenn. App. 1994). Substantial and material evidence "requires something less than a preponderance of the evidence but more than a scintilla or glimmer." *Wayne County v. Tennessee Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn. App. 1988) (citation omitted).

Under Tennessee statutes, an applicant is disqualified for unemployment benefits "[i]f the commissioner finds that a claimant has been discharged from such claimant's most recent work for misconduct connected with such claimant's work." Tenn. Code Ann. § 50-7-303(a)(2) (Supp. 1996). The misconduct must breach a duty which the employee owes to his employer, as opposed to society in general. *Weaver v. Wallace*, 565 S.W.2d 867, 870 (Tenn. 1978). In addition, the employee must be at fault. *McClellan v. Bible*, 699 S.W.2d 555, 556 (Tenn. 1985). In *Armstrong v. Neel*, 725 S.W.2d 953 (Tenn. App. 1986), this Court defined misconduct under the statute as:

> conduct evincing such wilful and wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of

4

inability or incapacity, inadvertences or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed "misconduct" within the meaning of the statute.

*Id.* at 956 (quoting ***Boynton Cab Co. v. Neubeck***, 296 N.W. 636, 640 (1941)).

In this case, the record contains substantial and material evidence from which TDES could conclude that Bedford was guilty of misconduct. There is no dispute that Bedford's actions were work related. She owed a clear duty to Methodist to follow its rules and procedures regarding the preparation of patients for the hyperbaric unit. The safety policies were in place to prevent a catastrophic accident in the chamber. These policies included a clear directive:

> 4. All cosmetics, oils, powder, lotions, and deodorant must [be] removed from the patient's body and hair before entering the HBO chamber.

Although Bedford testified that she had never seen this written policy before, she admitted that she was familiar with the patient guidelines and with a similar rule regarding non-compliant patients. In addition, Rallings testified that, the day before, she had warned Bedford about the necessity of removing makeup before placing a patient in the chamber. Clearly, there was sufficient evidence for TDES to find that Bedford "had a checklist [guidelines] which was used before each treatment, but she had always allowed patients to enter the HBO unit with minimal makeup and fingernail polish on, even though the checklist required removal."

Bedford explained that she allowed the patient to enter the chamber with makeup and fingernail polish because it was her understanding that water-based makeup posed no threat and that it would have been dangerous to remove the fingernail polish because of the vapors emitted from the alcohol used in removal. Regardless of Bedford's reasons, she knew the hospital's policies were put in place to protect the patient and the hospital, had been specifically told not to permit patients to wear any makeup, and yet knowingly and intentionally flouted those rules the day after being warned about them. In affirming TDES's decision, the Chancery Court stated:

> You know, you get to the point where you are dealing with something that will kill people and it can kill people and it has on numerous occasions killed people. You don't second-guess what [safety] position or plan has been laid down. You follow it.
>
> * * *
>
> We certainly want to encourage everybody that has the benefit of experience and training to make that known but you make that known by going to the proper authorities, the authorities that establish policy and try to prevail upon them to change the policy. You don't just ignore the policy because if you do then everybody is operating on a different wavelength and all bases are not being covered and things -- terrible things can happen.

5

Bedford's duty was to follow the procedures set forth in the hospital policies and the patient guidelines. Her willful refusal to do so constituted misconduct which disqualified her for unemployment benefits.

Bedford argues that, even if the denial of benefits is affirmed, she still should not have been ordered to repay the $1,100 in benefits initially paid to her. The repayment of overpaid benefits by the recipient is provided for in Tennessee Code Annotated § 50-7-303(d)(1), which states that "[a]ny person who is overpaid any amounts as benefits under this chapter is liable to repay those amounts, except as otherwise provided by this subsection (d) or by § 50-7-304(b)(2)." Tenn. Code Ann. § 50-7-303(d)(1) (Supp. 1996). Repayment may be waived by the Commissioner of Employment Security. Tenn. Code Ann. § 50-7-303(d)(2) (Supp. 1996). Waiver is appropriate only when the recipient did not commit fraud, misrepresentation, or willful nondisclosure to procure payment, the overpayment did not occur because of some fault on the part of the recipient, and "the recovery of the overpayment . . . would be against equity and good conscience." *Id.* All three criteria must be met in order for repayment to be waived. *Id.* The record in this case contains no evidence to establish that it would be against equity or good conscience for Bedford to be required to pay back the benefits initially paid her by TDES. Therefore, requiring repayment of her overpaid benefits is appropriate.

The decision of the trial court is affirmed. Costs are assessed against Appellant, for which execution may issue if necessary.


_____
_____HOLLY KIRBY LILLARD, J.

**CONCUR:**

_____
**W. FRANK CRAWFORD, P. J., W.S.**


_____
**ALAN E. HIGHERS, J.**

6