# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 3, 2003 Session

## ARTHUR L. LYNN v. RANDY C. CAMP, COMMISSIONER, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 01-3738-I     Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M2002-02708-COA-R3-CV - Filed October 22, 2003**

---

This case concerns a petition for judicial review filed in chancery court. The petition sought review of the ALJ's order affirming the Petitioner's termination for sleeping on the job in violation of the Arlington Development Center's policy. The chancellor dismissed the Petition. We affirm the Chancellor.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, J., and JAMES L. WEATHERFORD, SR. J., joined.

Larry D. Woods, Nashville, Tennessee, for the appellant, Arthur L. Lynn.

Paul G. Summers, Attorney General & Reporter; Steven B. McCloud, Assistant Attorney General, for the appellees, Randy C. Camp, Commissioner and Elisabeth Rukeyser, Commissioner of the Tennessee Department of Mental Health and Developmental Disabilities.

## OPINION

There is little dispute as to the material facts in this case. Arlington Developmental Center (ADC) is an in-house care facility operated by the Tennessee Department of Mental Health and Developmental Disabilities. The Holly Unit located in the Baker Building at ADC houses developmentally disabled citizens none of whom are ambulatory or otherwise able to care for themselves. The citizens in Holly Unit were considered more medically fragile than those maintained in other areas of the facility and required particular vigilance due to their inability to care for themselves or to articulate need for assistance.

Petitioner Arthur Lynn had for more than seven years been employed as a developmental technician observing and assisting such developmentally disabled citizens. Developmental technicians are required to check on each of the citizens assigned to them no less than every fifteen

minutes and to observe the patients carefully, provide any care required such as changing the patient's position or supplying dry clothing, and to report any physical difficulties the patient might have to the medical staff for treatment. The maximum number of citizens requiring direct supervision that could be assigned to any one developmental technician was three patients and the minimum number that could be assigned was one patient. The determination of which citizens required one on one coverage and which should have one on two or one on three coverage was made by a physician. Assignment of developmental technicians to three citizens per shift indicated that they were less at risk for medical emergencies and needed less intensive care than did citizens assigned staff assistance of one on one and one on two. At the beginning of each shift the supervisor assigned the available technicians to one, two, or three patients according to the information given about the patient's staffing needs and the number of workers present for the shift.

On the overnight shift of February 29 to March 1, 2000, Petitioner was working the ten o'clock p.m. to six o'clock a.m. shift. At the beginning of the shift, Tennie Gales, developmental technician supervisor for Holly Unit, assigned three developmentally disabled citizens to Petitioner's care. Petitioner was assigned to sit in a room with two of the citizens and to periodically go to a separate room where the other citizen was located. All three of the citizens assigned to Mr. Lynn were subject to seizures. Two of them were subject to hypothermic temperature variations and one had a tracheotomy tube that required periodic observation to insure that no aspiration or other blockage developed. During the shift at issue Holly had sixteen citizens and eight developmental technicians with three of the Petitioner's co-workers assigned two citizens each, three others assigned with only one citizen each, and one other co-worker assigned three citizens. Patient-staff ratios that night were at the maximum permitted with no overlapping coverage whereby the citizens assigned to Mr. Lynn received attention from other staff as well as Mr. Lynn.

At approximately twelve thirty a.m. on March 1, 2000, Ms. Gales, while making her supervisory rounds, discovered Petitioner asleep in a chair. She shook him to awaken him and told him to check on the citizens assigned to him. When she returned a few minutes later to see if her instructions had been followed she found Petitioner asleep again in the same position. She called her supervisor for advice and was directed to have the duty nurse accompany her to where Petitioner was sleeping. Ms. Gales returned to the room accompanied by nurse Rose Untal and found Petitioner asleep. She then awakened the Petitioner and told him to leave the unit.

Petitioner does not dispute that he was found sleeping on duty. He explained at the hearing before the Administrative Law Judge that he was suffering from allergies and sinus or cold-related problems and had taken an over-the-counter Benadryl-type medication. Upon these facts, Assistant Superintendent, Nina Staples, recommended that Petitioner be terminated. This recommendation was concurred in by the Director of Human Resources at ADC and by letter dated March 7, 2000 the Superintendent of ADC discharged Petitioner.

Consistent with Tennessee Department of Personnel Rule 1120-11-.05, Petitioner appealed his termination and a hearing was held before Administrative Law Judge Margaret Robertson on May 29, 2001. Judge Robertson denied Petitioner's grievance and upheld the decision of ADC to

terminate his employment. Mr. Lynn then filed his Petition for Review in the Chancery Court for Davidson County and following a hearing on April 25, 2002, the Chancellor affirmed the decision of the Administrative Law Judge finding that her decision was supported by substantial and material evidence.

Petitioner filed a timely notice of appeal.

Before proceeding to Mr. Lynn's issue on appeal the Court is constrained to note that prior to the activity which led to the instant action, the grievant had a superior performance record. As developmental technician Mr. Lynn earned several "superior" ratings in annual performance review. Indeed, on February 1, 2000, one month prior to the date of this infraction, Mr. Lynn received yet another overall rating of "superior" on his performance evaluation.

The gravamen of the Petition appears in paragraphs 18 through 21 of the Complaint:

18.     Petitioner has had a long career in state government with excellent performance and enjoys an outstanding reputation.
19.     Under such circumstances, termination of the petitioner was certainly unwarranted. Further, the Department failed to use or follow statutory requirements concerning progressive discipline.
20.     Based upon the above, the actions of the respondents violate the due process rights of Mr. Lynn, violate statutory provisions, are in excess of their statutory authority, were made upon unlawful procedures, were made in an improper manner, and were done in an arbitrary, capricious, abusive manner using a clearly unwarranted exercise of discretion. Further, the decision below is unsupported by evidence which is both substantial and material. In the alternative, the ADC sleeping policy is void for vagueness.
21.     For all these reasons, the termination of the petitioner should be reversed. The respondents should be ordered to reinstate Mr. Lynn and to pay back pay, benefits, and reasonable attorney's fees pursuant to 42 U.S.C. §1983, 1988, et seq. and costs.

Tennessee Code Annotated section 4-5-322(h)(2001) sets out the appropriate standard of review to be applied by the chancery court and is likewise binding upon this Court. Our supreme court has provided the following guidance concerning the standard:

When reviewing an agency decision, the appropriate standard of review is that set forth in the Administrative Procedures Act . . . In addition, such review is limited to the record of the case. Tenn. Code Ann. § 4-5-322(g). Findings of fact made by the agency may not be reviewed *de novo* by the trial or appellate courts, and courts should not substitute their judgment for that of the agency as to the weight of the evidence on factual issues. *Southern Ry. Co. v. Tennessee Bd. of Equalization* 682 S.W.2d 196, 199 (Tenn.1984); *CF Indus. v. Tennessee Pub. Serv. Comm'n*, 599

S.W.2d 536 (Tenn.1980); *National Council on Compensation Ins. v. Gaddis*, 786 S.W.2d 240, 242 (Tenn.Ct.App.1989). However, the "substantial and material evidence standard" in Tenn. Code Ann. § 4-5-322(h)(5) requires a searching and careful inquiry that subjects the agency's decision to close scrutiny. *Wayne County v. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 280 (Tenn.Ct.App.1988). Further, construction of a statute and application of the law to the facts is a question of law that may be addressed by the courts. *See Beare Co. v. Tennessee Dept. of Revenue*, 858 S.W.2d 906 (Tenn.1993).

*Sanifill of Tennessee, Inc. v. Tennessee Solid Waste Control Bd.*, 907 S.W.2d 807, 809-10 (Tenn.1995).

In this context, this Court is presented with the following issues on appeal:

I.      Whether the ALJ considered and applied the wrong portion of ADC's sleeping policy to Mr. Lynn's infraction;

II.     Whether the ADC rule is void for vagueness under the U.S. and Tennessee Constitutions;

III.    Whether the chancery court failed to find that the commissioner wrongly refused to apply Tennessee Code Annotated section 8-30-330.

The following facts found by the commissioner, with which the chancellor concurred, and to which Mr. Lynn admits, are of primary importance in the determination of these issues. Mr. Lynn admits that he was asleep while on duty as a developmental technician for ADC. Mr. Lynn likewise admits that he was asleep in the room occupied by two of the citizens over which he had charge. Mr. Lynn likewise admits that he was required to check on these patients every fifteen minutes. Mr. Lynn takes no issue with the statements of Nina Staples and Rose Untal taken before the Administrative Law Judge, which indicate that twice he had to be shaken before he would wake. Also of note is the fact that, of the sixteen citizens in the care of ADC on the night in question, none of Mr. Lynn's citizens were assigned to any other developmental technician in addition to Mr. Lynn. In the hearing before the Administrative Law Judge, conflicting evidence was presented concerning whether any other developmental technicians were in the room in which Mr. Lynn had fallen asleep who could render aid to the citizens in Mr. Lynn's direct care. That night Mr. Lynn was in charge of three citizens. All three of these citizens were in a unit known for housing individuals requiring tube feeding and periodic checks of tracheotomy tubes to avoid aspiration and asphyxiation. In evaluating whether the petitioner's termination was appropriate, the assistant director of ADC, Nina Staples, evaluated all of these circumstances and applied the following pertinent sections of ADC's Policy on Employee Sleeping:

B.      Disciplinary Action:

Any employee determined to be sleeping as specified in the aforementioned Section V.A. shall be subject to disciplinary action according to the Rules of the

Tennessee Department of Personnel (authority cited above in Section III). The Rule allows the Supervisor and ADC Management discretion in determining disciplinary action. Subsequent violations of categories "a" or "b" may result in progressive disciplinary action. Individual circumstances (e.g., length of time between violations, cause of sleeping, etc.) will be considered in these instances before action is taken.

1. Offenses and Corresponding Degrees of Disciplinary Actions

   a. If an employee is determined to be sleeping and is not responsible for direct citizen support, the employee will receive a written warning. An offense such as this would not directly place citizens at risk. [*Example* – a Support Series employee falls asleep at a desk or an employee falls asleep during a Staff Development class.]

   b. If an employee is determined to be sleeping and is responsible for direct citizen support, yet the employee is discovered sleeping in a setting where other employees, or co-workers, could at least account for the sleeping employee's citizen(s), the employee will receive a five-day (5) suspension. An offense such as this would directly place citizens at risk, although the risk may be considered 'low'. (Employees discovered sleeping who are responsible for 1:1 citizen coverage fall within the subsequent category "c" regardless of circumstance.)

   c. If an employee is determined to be sleeping and is responsible for direct citizen support, and such a determination occurs in any setting other than the type described in V.B.1.b., or creates significant risk for the citizen, the employee will be terminated from employment. Any employee discovered sleeping who is assigned 1:1 citizen coverage falls within this category. [*Example* – an employee falls asleep while providing one-to-one coverage at a hospital or an employee is discovered sleeping while assisting a citizen during mealtime.]

The plain unambiguous language of the sleeping policy provides that sleeping on duty shall subject a sleeping employee to disciplinary action. The plain language likewise accords management discretion in determining the appropriate disciplinary action. Contrary to Appellant's argument, subsection (b) does not require all employees discovered sleeping to be suspended five days as a first offense. The five day suspension provision only applies to employees "discovered sleeping in a setting where other employees or co-workers could at least account for the sleeping employee's citizen(s)." With regard to whether other employees or co-workers could account for Mr. Lynn's assigned citizens, the proof before the Administrative Law Judge is conflicting. Tennie Gales provided the following testimony:

Q.     And during that 30 minutes, or maybe 27 minutes until you and Nurse Rose get there, the only citizen coverage for Brian and Calvin is Mr. Lynn, correct?

A.     He was in the room.

Q.     Was anybody else in the room?

A.     No.

The following testimony given by Nina Staples, Assistant Superintendent for residential and supported living at ADC, further explains the coverage controversy:

> And then the next question would be:  Was the employee working with citizens, period; meaning was the employee assigned to citizens.  And in this instance, Mr. Lynn was assigned to three citizens that night.
>
> The other question becomes a question of, if when he was discovered asleep, was there someone else that could take care of or address the needs of this citizen.  And in the case of the room that he was in with Brian and Calvin, it was my understanding that there may have been another person present, but that the other person could not assume that responsibility because that other person had an assignment.  And if that person took on any more, then that person would have - - we would have been out of our ratio.  And our ratio - - the ratio for that other person would have exceeded her ratio.  And that was the reason why she would not have been able to assume any additional responsibilities for citizen care.

In addition to the aforementioned testimony, the ALJ heard from Ronald Bruce, the Director of Personnel; Tiffany Moffett, a former employee with ADC; Rose Untal, the nurse on duty at the time of Mr. Lynn's infraction, and Mr. Lynn himself.  After the hearing the Administrative Law Judge entered a fairly lengthy order in which it found, in pertinent part:

> The preponderance of the evidence in this matter is that the Grievant's offense falls into category (c) rather than category (b), in spite of the testimony to the contrary elicited from Ms. Staples.  Category (c) applies to two types of situations, which include a situation where an employee is assigned to 1:1 citizen coverage.  Category (c) applies when an employee is responsible for direct citizen support, and is found sleeping in any setting other than that described in (b), that being a setting in which other employees or co-workers could account for the citizens charged to the care of the sleeping employee.  Category (c) also applies when the employee's sleeping creates significant risk for the citizen(s) to whom he is assigned.  In the instant case, Grievant Lynn was directly responsible for three citizens.  No other employees were available to overlap with Grievant Lynn's responsibilities.  The number of staff on duty  that night was just enough to meet staffing requirements at required levels for the number of citizens and the level of staffing their conditions required.  The loss of Mr. Lynn's services that night required that his supervisor assume direct care responsibility for three citizens in order for the unit to continue to meet required staffing levels during the shift.

10.    Sleeping by Mr. Lynn caused significant risk to the citizens assigned to his care.  These citizens were mentally retarded, non-ambulatory, had seizure disorders and may have had feeding tubes, tracheostomies (sic), and vulnerability to hypothermia.  They required regular monitoring at brief intervals and the continual presence of someone who could quickly observe a developing medical problem and be able to make a timely call to a medical professional.  The absence of oversight by the staff member assigned to stand watch over them placed them at significant risk because of their medically fragile conditions.  Grievant Lynn's argument that the fact that the citizens assigned to him were suitable for assignment to a 3:1 citizen-to-staff ratio meant that the situation was necessarily a low risk one and thus restricted to a category (b) offense is not persuasive.  Grievant Lynn's sleeping on duty clearly falls into category (c) both because of the lack of other employees to cover his dereliction of duty and because of the medically fragile state of his charges.  In category (b), the risk is described as low because of the availability of other employees to shoulder the responsibilities of the sleeping employee for his assigned citizens so that no coverage is lost.  Sleeping while responsible for coverage at the 1:1 staffing ratio is an extreme example of a category (c) violation, not the only example.  Grievant Lynn's violation of falling asleep while on duty clearly violates category (c) of the Employee Sleeping policy, which directs that the  appropriate discipline is termination.  Therefore the discipline applied to him, which was termination, was consistent with the policy.

The chancellor held that the Administrative Law Judge's finding was supported by substantial and material evidence.  The Administrative Law Judge's application of the sleeping policy depended on the material facts presented in the Administrative hearing.  It is well settled that we do not substitute our judgment on appeal for that of the ALJ and the chancellor.  Thus, we find no error in the trial court's dismissal of Mr. Lynn's Petition for Review of the Administrative Law Judge.

Regarding Appellant's argument that the ADC rule is void for vagueness, the plain language of the rule gives no room for doubt that sleeping on the job would subject the employee to discipline, and that the enforcement of the provisions of the policy left no doubt as to the employees' risks of discipline and/or termination in the event of a violation.  The findings are supported by substantial and material evidence.

As for Appellant's third issue concerning the progressive discipline language in Tennessee Code Annotated section 8-30-330, the plain language of that statute as well as the sleeping policy in place at ADC made it very clear that management retained broad discretion in describing those situations warranting progressive discipline and those situations imposing such risk that progressive discipline was not necessary.  Section 330 provides that discipline be appropriate for the offense:

(a)  The supervisor is responsible for maintaining the proper performance level, conduct, and discipline of the employees under the supervisor's supervision.  When

corrective action is necessary, the supervisor must administer disciplinary action beginning at the lowest appropriate step for each area of misconduct.

(b) Any written warning or written follow-up to an oral warning which has been issued to an employee shall be automatically expunged from the employee's personnel file after a period of two (2) years; provided, that the employee has had no further disciplinary actions with respect to the same area of performance, conduct, and discipline.

(c) When corrective action is necessary, the supervisor must administer disciplinary action beginning at the step appropriate to the infraction or performance. Subsequent infractions or poor performance may result in more severe discipline in accordance with subsection (a).

Tenn. Code Ann. § 8-30-330 (1986).

The limited standard of review in this case does not permit this Court to second-guess the wisdom of the judgment of ADC. The discussion by this Court in *Papachristou v. University of Tennessee*, 29 S.W.3d 487 (Tenn.Ct.App.2000) is enlightening and reflects the limitations on judicial control mandated by Tennessee Code Annotated section 4-5-322(h).

> Tenn.Code Ann. § 4-5-322(h) states that upon judicial review of an agency's findings
>
> (h)     The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1)     In violation of constitutional or statutory provisions;
>
> (2)     In excess of the statutory authority of the agency;
>
> (3)     Made upon unlawful procedure;
>
> (4)     Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or clearly unwarranted exercise of discretion; or
>
> (5)     Unsupported by evidence which is both substantial and material in the light of the entire record.
>
> In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.
>
> "Substantial and material evidence" has been defined as " 'such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration.' " *Clay County Manor, Inc. v. State of Tennessee4*, 8949 S.W.2d 755, 759 (Tenn.1993) (*quoting Southern Railway Co. v. State Board of Equalization*, 682 S.W.2d 196, 199 (Tenn.1984)).
>
> . . . .

When reviewing administrative decisions, the courts do not make de novo decisions about the credibility of witnesses. *Crass v. Tennessee Valley Authority*, 460 F.Supp. 941 (D.C.Tenn.1978), *aff'd* 627 F.2d 1089 (6th Cir.1978). Neither the trial court nor this court may review issues of fact de novo or substitute the court's judgment for that of the agency as to the weight of the evidence. *Reece v. Tennessee Civil Service Commission*, 699 S.W.2d 808 (Tenn.Ct.App.1985). With substantial and material proof in the record on which the University Chancellor's findings could be based, the action taken must be affirmed.

*Papachristou v. University of Tennessee*, 29 S.W.3d 487, 490-91 (Tenn.2000).

The temptation is strong to try to give relief to a man whose "superior" performance in the past is unquestioned. There is, however, "evidence which is both substantial and material" in the record to support the judgment of the Administrative Law Judge and of the Chancellor. At this point, the appellate inquiry comes to an end.

The judgment of the trial court is in all respects affirmed. Costs of appeal are taxed against Appellant for which execution may issue.

_____
WILLIAM B. CAIN, JUDGE