IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 10, 2001 Session

## JOHN M. CAPPELLO v. HAZEL R. ALBERT, Commissioner, Tennessee Department of Labor, et al.

**A Direct Appeal from the Chancery Court for Davidson County**
**No. 99-1741-I     The Honorable Irvin H. Kilcrease, Jr., Chancellor**

**No. M2000-02104-COA-R3-CV - Filed September 27, 2001**

A corrections officer with the Tennessee Department of Correction, after being discharged for allegedly purchasing a television from an inmate at the institution where he serves, was denied unemployment benefits. The officer's petition for certiorari to the chancery court was dismissed, and the officer has appealed. We affirm.

**Tenn.R.App.P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

August C. Winter, Brentwood, For Appellant, John M. Cappello

William B. Hutcherson, Jr., Nashville, For Appellee, Tennessee Department of Correction

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, For Appellee, Tennessee Department of Labor and Workforce Development, Employment Security Division

### OPINION

Petitioner, John M. Cappello ("Cappello"), appeals from the trial court's order dismissing his petition for certiorari and affirming the decision of the Board of Review that disallowed his claim for unemployment compensation.

Cappello was employed by the Tennessee Department of Correction ("TDOC") as a corrections officer at the Middle Tennessee Correctional Complex. According to the January 19, 1999, termination memorandum, Cappello was terminated for allegedly purchasing a television set

for $40.00 from an inmate in violation of official policy. The termination memorandum to Cappello from Warden, David L. Poindexter, states in pertinent part as follows:

A due process hearing was held on Tuesday, January 5, 1999, at 1:00 p.m. in my conference room for the purpose of hearing any testimony and reviewing any documentation you wished to present in defense of the following charges:

1) Violation of TDOC policy 302.04
2) Violation of policy 305.03
3) Violation of Oath of Office

Specifically, you were charged with bartering with inmate David Petty #96798, by paying him $40 in exchange for his 10" Zenith television, and providing mailing instructions for same. Present at the hearing, in addition to you and me, was Deputy Warden Kenneth Locke and your witness, Joey Harrington. You stated at the beginning of the meeting that you were prepared and it was further established that your witness, Joey Harrington, was your wife's son who lives on the first floor of your home at 8013 Esterbrook Drive in Nashville. After reading the charges against you, you were asked how you plead to the charges to which you replied "Not Guilty."

I presented you with copies of policy 302.04, 305.03 and the Oath of Office and asked if you were familiar with the contents of each, to which you replied, "yes." I further asked you to look at a Memorandum of Understanding that is in your personnel file which was signed February 4, 1994. You indicated upon examination that you did sign and were aware of its contents. I questioned you about your relationship with inmate David Petty #96798. You responded that you knew him, but that your relationship essentially was an inmate/correctional officer relationship and that there was nothing special about him other than you remembered you had to correct him on the yard one time over a game of poker. You were asked if you knew anything about Petty's alleged allegation that he had sold you a T.V. in exchange for $40 and had mailed it to a Joey Harrington upon your direction at your home address. You indicated that at the time of the first I.A. investigation you did not know anything about the T.V., but that since that time you had found out information about the T.V. from your wife's son, Joey Harrington. You were asked if you were aware of a parcel being delivered and received at the Esterbrook address from inmate Perry (sic) to which you responded that you were now, but weren't aware of it in September. You were

-2-

further asked what you would do if such item was knowingly sent to your address, to which you replied, "go to a supervisor or someone in authority."

You stated that you knew nothing about the T.V. during the first I.A. investigation which was concluded on September 29, 1998, and that you did not recall Joey Harrington's name being brought up in connection with the T.V. until around the time you received the due process dated December 16, 1998.

At that point, Mr. Harrington was asked to relate what he knew about the television. He stated for the record that he knew a Sandra Petty and that he saw her in October or November during which time she asked him if he wanted to buy a used T.V. for $40? He stated that he did not know who the T.V. belonged to. He decided to purchase the T.V. as a Christmas gift for his girlfriend who lives in Arizona. A few days later, he ran into Sandra Petty again at a party and gave her the $40 and his address as she indicated the T.V. would be mailed to him. In December, he found the T.V. that had been sent through the mail at his house. He did not know who accepted it; it was just there when he got in from being out of town.

Mr. Harrington was repeatedly asked about the date that he made the agreement to purchase the T.V. He was unclear as to the exact date, but did narrow it down to late October or early November. Mr. Cappello was asked if he had anything to add to his testimony and he indicated he had a letter from his attorney that I could read, which I did. After reading, I determined that the content had no immediate bearing on the current charges. Mr. Harrington, likewise, was asked if he had anything to add and he indicated that he did not but would be available for further questioning if needed at a later date. The meeting was concluded.

I have reviewed the I.A. report of the investigation conducted in September and the follow-up investigation in November. There are direct conflicts in testimony heard on January 5, 1999 (Cappello/Harrington) and the contents of the report(s):

1)      You stated in the hearing that you "couldn't recall" Joey Harrington's name being brought up regarding the delivery of the T.V. during the first I.A. questioning, and that's why you waited from September until December (3 months) to question

Harrington about the T.V. The I.A. report indicates that on September 22, Investigators Gil Mathis and Debbie Copeland interviewed you and you were specifically asked about a Joey Harrington. Again on November 16, 1998, the two investigators went to the Esterbrook address and when you came to the door, they asked to see Joey Harrington. It is inconceivable to me that you would wait three (3) months (September to December) to ask Mr. Harrington why they specifically asked to talk to him in connection with the T.V. knowing that you were under active investigation.

2) You stated during the I.A. investigation on September 22, 1998 and again for the record on January 5, that you were not aware of a parcel being delivered to your address from inmate Perry (sic).

The United States postal inspector for this area worked in coordination with I.A. in the delivery of the T.V. to your residence via U.S. mail on September 15, 1998, between 10:30 and 11:00 a.m. The package with the inmate's name, number and return prison address was hand delivered to the Esterbrook address and you accepted it (positive I.D. has been made by the delivery person against a driver's license picture obtained through the TBI, in conjunction with the Department of Safety).

3) You stated on January 5 that if a package from an inmate were knowingly sent to your address, you would report it to your supervisor or other official. I.A. intentionally waited from the delivery date of September 15 until the day the investigators questioned you on September 22 to give you ample time to return the T.V. You didn't do [sic] and in fact stated repeatedly that you knew nothing about it until mid December.

4) Mr. Harrington stated during the January 5 meeting that he bought the T.V. in October or November. Had this been the case, it couldn't have been delivered September 15.

-4-

If one accepts the facts documented in the I.A. investigation and documented report as correct, which I do, then the answers given by you and Mr. Harrington – which represent a marked difference to the report – would have to be judged as highly questionable to the extent of being untruthful or false.

In conclusion, based on all facts, testimony and evidence I have at my disposal, it is my determination that you are guilty of violation of TDOC policy 305.03, 302.04 and the Oath of Office which you signed and swore to uphold. By knowingly doing this, you have rendered yourself unfit to do your job as a correctional officer which by your own definition on January 5, is to "rehabilitate inmates, prevent fights, counsel inmates, take orders from supervisors and enforce TDOC and institutional policies and procedures." Additionally, I have reviewed your personnel file which is replete with policy violations including, but certainly not limited to, 1) providing a forged document for employment purposes, 2) written warning for conduct unbecoming a state employee 10/31/95 (falsifying a weapons qualification target in order to qualify; and 3) suspension (5/25/95) for violating the same two policies and oath you are currently charged with, and numerous other infractions and violations of policy.

In consideration of the seriousness of this incident, a careful review of your personnel file, and the fact that your actions continue to establish the profile of an employee who has no desire to work within the guidelines of TDOC policy, I am, therefore, terminating you from state service. You are hereby given 10 days notice in accordance with DOP Rules and Regulations 1120-10-.07(5)(C), which will begin on January 19 and end on January 28, 1999. Effective January 29, you will be paid for your compensatory time and your accrued annual leave will be applied to terminal leave.

\* \* \*

You may appeal this decision through the grievance procedure. If you wish to appeal through the grievance procedure, you should obtain a form from this office, review the Department of Personnel Rules, Chapter 1120-11-2, and file any such grievance within fifteen (15) workdays. If you have any questions concerning your appeal rights, you should contact the State Information Line at 615-741-1859.

Cappello did not appeal the decision, and on January 29, 1999, Cappello completed and signed an initial claim form for unemployment compensation and signed an unemployment insurance questionnaire. On February 12, 1999, the Tennessee Department of Employment Security ("TDES") denied Cappello's claim for unemployment compensation under T.C.A. § 50-7-303, because Cappello was discharged for work-related misconduct. On February 16, 1999, Cappello appealed this decision to the Appeals Tribunal of TDES, and on March 31, 1999, an evidentiary hearing was held.

The decision of the Appeals Tribunal was mailed to the interested parties on April 1, 1999, and states in pertinent part:

> FINDINGS OF FACT: Claimant's most recent employment prior to filing this claim was with the Tennessee Department of Correction, where he worked as a correctional officer from September 1, 1978, until January 19, 1999. The claimant befriended an inmate and purchased a TV from the inmate in exchange for $40.00. The claimant had the inmate send the TV via U.S. Mail to his home address. The company has a policy, which prohibits correctional officers from trading or bartering with inmates or their families. The incident was investigated and the claimant was terminated from his job.
>
> CONCLUSIONS OF LAW: The Appeals Tribunal finds that the claimant was terminated from his most recent employment when he purchased a TV set from an inmate, which is against company policy. The claimant contends that the TV was purchased by his stepson of which claimant had no knowledge. The evidence in the record shows that the claimant in his statement to the local office representative, which is page three of exhibit one in the Agency file, states that he bought a TV from the inmate. Also the claimant's witness is not credible. The claimant's witness testified that he had an arrangement in October or November of 1998, in which he purchased the TV and gave the inmates' wife $40.00 for the purchase of the TV, which was delivered to the claimant's home on September 15, 1998, and the claimant was questioned about the incident as early as September 22, 1998. Therefore, the claimant's behavior constitutes a willful and deliberate disregard against the employer's interest and is considered work-related misconduct under TCA § 50-7-303(a)(2). The Agency decision is affirmed.
>
> DECISION: The claimant is not eligible for unemployment benefits under TCA § 50-7-303(a)(2). The claim is denied as of the date of

-6-

filing and until the claimant qualifies for benefits in accordance with the Tennessee Employment Security Law.

Cappello duly appealed to the Board of Review, and the Board issued its decision May 13, 1999, which states:

HISTORY OF THE CASE: This claimant filed an initial claim for unemployment compensation on January 29, 1999. On February 12, 1999, the Agency disallowed the claim under TCA § 50-7-303(a)(2). The claimant filed an appeal to the Appeals Tribunal on February 16, 1999. A hearing was conducted on this case in Nashville, Tennessee, on March 16, 1999, which was rescheduled. A hearing was conducted in Nashville, Tennessee, on March 31, 1999, at which time both the claimant and employer testified. By decision #99-AT-02507 A dated April 1, 1999, the Appeals Tribunal affirmed the Agency's decision. From this decision, the claimant filed an appeal to the Board of Review on April 16, 1999.

FINDINGS OF FACT AND CONCLUSIONS OF LAW: Based upon the entire record in this cause, the Board of Review finds the Appeals Tribunal correctly found the facts and applied the law under TCA § 50-7-303(a). We hereby adopt the findings of fact and decision of the Appeals Tribunal but the same need not be copied herein for the purpose of our decision. Counsel for the claimant has requested a hearing to present testimony from a witness. He has not explained why this witness was not presented at the Appeals Tribunal hearing. The request for another hearing is, therefore, denied.

DECISION: The decision of the Appeals Tribunal is affirmed.

This decision constituted the final decision of the Commissioner of Employment Security, and Cappello filed a petition for certiorari in the Chancery Court for review of the Commissioner's final decision. The Chancellor dismissed the petition for certiorari and affirmed the Commissioner's final decision which resulted in this appeal.

Cappello argues that none of the evidence in this case supports the position that he purchased the television from Petty in violation of TDOC policy. Cappello argues that the employer's evidence that Cappello was present when the packaged television was delivered to his address is hearsay and not evidence that Cappello knew what was inside the package or who sent it. Cappello's testimony is that he never saw the television and never took delivery of a package addressed to Joey Harrington. Cappello also argues that Harrington's lapse of memory as to the events in question and inability to provide effective testimony as to the exact dates in question does not constitute substantial and material evidence.

We will now summarize the testimony of each witness:

## DEBBIE COPELAND

Ms. Copeland was a TDOC internal affairs investigator who handled the investigation to determine whether Cappello bartered with an inmate in violation of TDOC policy. After inmate Petty failed a drug screen test, a search of Petty's property led to the discovery of Cappello's address. The TDOC, along with the Tennessee Bureau of Investigation, verified Cappello's address through several sources, and it was at this address Cappello received his pay checks from the State. She noted that other records indicated that the address found in Petty's property was Cappello's residence which was 8013 Esterbrook Drive in Nashville, Tennessee. She interviewed Petty, and Petty told her that he considered Cappello to be a friend. She futher testified that, according to Petty, it was common knowledge that Petty was up for parole, and because of his need for money he would sell some of his property to any "takers." Petty took the television to the mail room and asked for assistance in mailing the television, but the actual mailing was not completed. Internal Affairs decided to carry out a control mailing with the assistance of the U. S. Postal Inspector, and on September 15, 1998, in mid-morning the television package was delivered. Ms. Copeland testified that she was told by the Postal Inspector that at the time the package was delivered, the mail carrier identified Cappello from photographs as the person receiving the package.

Ms. Copeland further testified that Cappello never reported that he received the television, and when she interviewed him on September 22, 1998, he denied any knowledge of the television. He also refused to allow the search of his residence. She opined that her investigation indicated that Cappello did, in fact, barter with Petty for the television, and that this was in clear violation of TDOC policy.

## KEN LOCKE

Mr. Locke was a Deputy Warden of the Middle Tennessee Correctional Complex during the time period involved. He received instructions to mail the television to 8013 Esterbrook Drive, Nashville, Tennessee, 37221, which is the same address for Mr. Cappello and his step-son, Harrington. Mr. Locke identified the due process form letter sent to Cappello and testified concerning TDOC Policy No. 302.04 (conflict of interest) and TDOC Policy No. 305.03 (trading or bartering with an inmate). He also testified concerning the oath of office taken by TDOC officers. Mr. Locke served as a member of the due process panel for Cappello's termination and was present when Cappello met with the warden on January 5, 1999. He testified that Cappello was provided an opportunity to address the charges brought against him, and that the statements attributed to Cappello and his step-son, Harrington, at the hearing are accurately reflected in the termination memorandum, dated January 19, 1999. According to Mr. Locke's testimony, Cappello was discharged because he violated TDOC policy and compromised his ability to function as a correctional officer.

## JOHN M. CAPPELLO

He stated that he had no knowledge that his step-son, Harrington, had purchased the television from Petty. He described the physical layout of his house and the living arrangements he shared with his step-son. He stated that his house had two-stories with separate entrances, and that Harrington lived downstairs, and Cappello and his wife lived upstairs. He testified that he never took any delivery of any package addressed to Harrington that was sent from inmate Petty's address, and he had no knowledge until early or mid-November, 1998, that his wife had taken possession of any package from Petty. He stated that he eventually found out about the television from Harrington and that Harrington some how knew Petty's wife, Sandra Petty, and that he bought the television from her. Cappello admitted that he had signed the unemployment insurance questionnaire which stated as a reason for his discharge from the TDOC that, "I bought a TV from an inmate." He stated that he did not write the words on the form, but he signed it, although he did not read the form before he signed it. He adamantly denied any involvement with the purchase of the television from Petty.

Although the chancellor can reverse, remand, or modify the administrative decision, the court is prohibited from substituting its judgment for that of the Board of Review as to the weight of the evidence as to questions of fact. T.C.A. § 50-7-304 (i)(3) (1999). Furthermore, when the resolution of the issues in a case, such as this one, depends upon the truthfulness of witnesses, the fact finder who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id*.; *In re Estate of Walton v. Young,* 950 S.W.2d 956, 959 (Tenn. 1997).

Cappello asserts that the evidence from Ms. Copeland that he was identified as receiving the package delivered is hearsay and should not have been admitted. T.C.A. § 4-5-313 (1998) governs the admissibility of evidence in administrative proceedings and states in pertinent part:

> **4-5-313. Rules of evidence - Affidavits - Official notice.** - In contested cases:
>
> (1) The agency shall admit and give probative effect to evidence admissible in a court, and when necessary to ascertain facts not reasonably susceptible to proof under the rules of court, evidence not admissible thereunder may be admitted if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. . . .

Although hearsay evidence is admissible in an administrative proceeding, "uncorroborated hearsay or rumor would not constitute 'substantial evidence' where the scope of review was limited to a search for 'substantial evidence.'" *See Goodwin v. Metropolitan Bd. of Health*, 656 S.W.2d 383, 388 (Tenn. Ct. App. 1983). In the case at bar, it is undisputed that the television was mailed from the inmate to Cappello's home address. That evidence certainly corroborates that the television

arrived at his residence and does corroborate, to some extent, the identification made by the postal employee.

Misconduct connected to a claimant's work disqualifies the claimant from receiving unemployment benefits. T.C.A. § 50-7-303 (a)(2) (1999). It is undisputed that TDOC policy prohibits the purchase of a television by a corrections officer or his family from an inmate. Cappello's testimony concerning his failure to contact Harrington concerning the television after he was put on notice of the serious allegations does illustrate questionable conduct on his part. Moreover, the testimony of Cappello's step-son, Harrington, was determined not to be credible, and we must agree with that determination. According to Harrington's testimony, he bought the television without having seen it and gave cash to a virtual stranger on her promise to have the television sent to him. It was a mere coincidence that the stranger happened to be the inmate's wife. The record is quite clear that Harrington's testimony concerning the date he bought the television is inconsistent.

Most compelling, however, is the claimant's separation questionnaire filed by Cappello in his claim for unemployment compensation. The questionnaire states:

1. Were you discharged for violation of a company policy/rule?

    X    Yes              No

He was then asked:

a. What did you do that was considered a violation?

Answer: I bought a T.V. from an inmate.

This separation form was signed January 29, 1999 by the petitioner, John Cappello. In his testimony, Cappello states that he did not read the form before he signed it, and that he did not mean that he actually bought a television from an inmate, but that he was accused of buying a television from an inmate.

The rules of contract law concerning written contracts appear to be equally applicable to any representation made in a writing by a party. As our Supreme Court stated in *De Ford v. National Life & Accident Ins. Co.*, 185 S.W.2d 617 (Tenn. 1945):

> "It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signed, he

along is responsible for his omission." ***Upton v. Tribilcock***, 91 U.S. 45, 50, 23 L.Ed. 203.

***Id.*** at 621.

This Court must affirm the decision below if it is supported by substantial and material evidence. T.C.A. § 50-7-304 (i)(2)(E) (1999). Substantial and material evidence has been defined as any "relevant evidence which a reasonable mind might accept to support a rational conclusion, and which furnishes a reasonably sound basis for the action being reviewed." ***Frogge v. Davenport***, 906 S.W.2d 920, 922 (Tenn. Ct. App. 1995)(citing ***Southern Railway Co. v. State Bd. of Equalization***, 682 S.W.2d 196, 199 (Tenn. 1984)). In ***Sebastian v. Bible***, 649 S.W.2d 593 (Tenn. Ct. App. 1983), the court held:

> In order to sustain the Board of Review's application of the provisions of the statute, we need not find that its construction is the only reasonable one or even that it is the result we would have reached had the question arisen in the first instance in a judicial proceeding. The reviewing court's function is severely limited. All that is needed to support the commission's interpretation is that it has warrant in the record and a reasonable basis in law.

***Id.*** at 594-95 (citing *Cawthron v. Scott*, 400 S.W.2d 240, 242 (Tenn. 1966)).

Accordingly, the order of the trial court is affirmed, and the case is remanded for such further proceedings as are necessary. Costs of the appeal are assessed against the appellant, John M. Cappello, and his surety.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.