IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
January 20, 2004 Session

## QUINTON ARMSTRONG
v.
## MICHAEL MAGILL, COMMISSIONER OF THE TENNESSEE DEPARTMENT OF LABOR AND WORKFORCE DEVELOPMENT, AND PICCADILLY CAFETERIA

**An Appeal from the Chancery Court for Shelby County**
**No. CH-02-0234-3     D. J. Alissandratos, Chancellor**

---

**No. W2003-00207-COA-R3-CV - Filed June 29, 2004**

---

This is a claim for unemployment benefits. The claimant was terminated from her employment at the defendant business. Her separation notice indicated that she was terminated for improper conduct and having a disrespectful attitude. Subsequently, the claimant filed a claim for unemployment benefits. The agency denied benefits. The claimant appealed. The appellate tribunal conducted a telephonic hearing and affirmed the denial of benefits. The claimant filed the instant petition for judicial review, claiming that the administrative proceedings were so fundamentally flawed that her procedural due process rights were violated. The trial court denied the petition and affirmed the denial of benefits. The claimant now appeals. We affirm, finding that the claimant's due process rights were not violated, and that there is substantial and material evidence to support the denial of benefits.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Karen W. Tyler and Webb A. Brewer, Memphis, Tennessee, for the appellant, Quinton Armstrong.

Paul G. Summers, Attorney General & Reporter, and Warren A. Jasper, Assistant Attorney General, Nashville, Tennessee, for the appellee, Michael Magill, Commissioner of the Tennessee Department of Labor and Workforce Development.

### OPINION

Plaintiff/Appellant Quinton Armstrong ("Armstrong") worked at the Piccadilly Cafeteria ("Piccadilly") as a full-time cook for about sixteen years, from May 1985 until July 2001. On July 10, 2001, she was fired. The separation notice issued to her on that date stated that the basis for her

termination was "[i]mproper conduct, not willing to work with others, disrespectful toward coworkers and managers."

On July 12, 2001, Armstrong filed a claim for unemployment benefits with the Tennessee Department of Labor and Workforce Development ("Agency"). On August 1, 2001, the Agency denied Armstrong's application. The agency found that Armstrong had been terminated for misconduct connected with work, which disqualified her for benefits. *See* Tenn. Code Ann. § 50-7-303(a)(2).

On August 13, 2001, Armstrong filed an appeal from the denial of benefits to the Appeals Tribunal. On the form Armstrong filled out to appeal, there was a box in the upper right-hand corner in which the applicant could mark "telephone" or "in person," indicating that she could state whether she preferred for her appeals hearing to be by telephone or in person. Armstrong checked neither box on her application. Subsequently, Armstrong was sent a "Notice of Telephone Hearing," informing her that a telephonic hearing had been scheduled for her appeal. The notice included instructions which stated, "IF YOU DO NOT AGREE TO A TELEPHONE HEARING, contact the Appeals Tribunal immediately and be prepared to appear in person. . . ." The notice also advised Armstrong of her right to obtain a legal representative and of the availability of free or low-cost legal assistance. In response, Armstrong sent correspondence to the Appeals Tribunal requesting a different time for the hearing. She did not send a written request for an in-person hearing.

On September 20, 2001, the hearing officer of the Appeals Tribunal conducted a *de novo* telephone hearing on the record. Armstrong represented herself at the hearing. The Piccadilly representatives participating in the hearing were Elter Carter ("Carter"), who was Piccadilly's production manager and Armstrong's supervisor, and Iester Smith ("Smith"), a chef for Piccadilly who had worked with Armstrong for many years. At the outset, Armstrong said that she wondered why the hearing had to be over the telephone. The hearing officer asked Armstrong if she had requested an in-person hearing, and Armstrong stated that she had done so. The hearing officer pointed out that there was no preference for an in-person hearing indicated on Armstrong's appeal notice, and told Armstrong that she could have requested that the hearing take place "in person." Armstrong responded, "I did that, but anyway, okay." Thereafter, the telephone hearing proceeded as scheduled without objection to the procedure.

The hearing officer first informed the parties of several documents that she had reviewed in preparation for the hearing. Piccadilly had submitted several documents, including copies of pertinent company policies and procedures, a signed acknowledgment showing that Armstrong had received a copy of those policies, and other documents from Armstrong's personnel file. The personnel file included warnings that were issued to Armstrong over a year prior to her termination, which the hearing officer said would not be considered relevant. The hearing officer also noted, however, that three of the warnings in Armstrong's personnel file had been issued within the previous year. The recent warnings were for lack of cooperation, non-performance, and failure to follow management's instructions. Piccadilly submitted other documents related to harassment charges filed against Armstrong by her co-worker, Georgia Calicutt ("Calicutt"). Copies of these

documents were not sent to Armstrong prior to the hearing. Armstrong told the hearing officer, however, that she had no questions about the documents, and she did not object to their consideration.

The first person to testify at the telephone hearing was Carter, who had signed the separation notice on Armstrong's termination. Carter testified that she became Piccadilly's production manager in June of 2000. In that capacity, she began to work with the kitchen personnel, including Armstrong. She asserted that Armstrong was uncooperative with her and with other employees and was "antagonistic at every turn." Carter testified about an incident in November 2000 in which Armstrong and another employee received a warning for getting into a hostile exchange of words followed by "slight body contact" in violation of company policy. She also testified about another incident in January 2001 in which Armstrong received a warning for refusing to cooperate with other workers to ensure that food was properly transferred to the line for consumption. Finally, Carter referred to an incident in March 2001 in which Armstrong was written up for refusing to "tighten up" runny mashed potatoes in a timely manner when asked to do so. Carter said that whenever she spoke to Armstrong about her uncooperative behavior, Armstrong was belligerent and acted as though Carter had offended her by correcting her. "It was – that was just her attitude. Her demeanor was that all the time." Carter testified that, because of her problems with Armstrong, she transferred Armstrong from early cook to an early prep, pot-wash, and clean up position, in order to "keep down a lot of conflict." In the early cook position, Carter replaced Armstrong with Calicutt, who had less seniority than Armstrong. This created hostility between Armstrong and Calicutt, because Armstrong believed that Calicutt took her job away. Carter met with Armstrong and Calicutt to resolve their problems with one another, to no avail. Calicutt filed a harassment charge against Armstrong for her hostile behavior. The situation between the two women, along with all the other circumstances, led to Piccadilly's decision to terminate Armstrong's employment.

Smith also testified. She agreed with Carter's testimony and agreed also that Armstrong believed that Calicutt took her job as a cook. Smith said that she got along well with Armstrong because she "knew how to deal with her." On June 25, 2001, Smith had signed a statement, drafted by Carter, indicating that she witnessed Armstrong's harassment of Calicutt. Smith's statement said that she "constantly mediates between the two cooks to try to keep the conflicts from getting out of hand." Smith asserted that the only recourse was to get Calicutt to "be quiet, not respond to [Armstrong] in any manner," but that Armstrong refused to do the same. Smith said that Armstrong had been hostile to many people, and that Calicutt's complaint was "founded in truth." At the telephonic hearing, Smith said that she still stood by her June 2001 statement. Smith testified that she had worked with Armstrong during Armstrong's tenure at Piccadilly, and that Armstrong had a poor attitude and was disruptive at work, particularly in the final months of her tenure.

Armstrong testified on her own behalf. She said that Carter was a "blatant liar," and asserted that Carter's testimony should be discredited because she only worked with Carter for a few hours a week. She said that Smith was a liar as well, and that Smith's statements about her harassing Calicutt were untrue. Armstrong said that she had no problems with the staff at the Piccadilly, and that Carter was lying when she said that, on several occasions, she called Armstrong into the office

to discuss her behavior. Armstrong claimed that she did not harass Calicutt, and alleged that Calicutt in fact harassed her. Regarding the other incidents mentioned by Carter, Armstrong stated that Carter was "picking on" her, and that her behavior was not inappropriate as Carter testified. Referring to the meeting among Carter, Calicutt, and Armstrong, Armstrong said that she expressed a willingness to continue to work with Calicutt, but that Calicutt was not willing to continue working with Armstrong. Armstrong stated that soon after the meeting, Bill Moran ("Moran"), the general manager, told her she was no longer needed at Piccadilly.

On September 26, 2001, the Appeals Tribunal issued a decision affirming the Agency's determination, concluding that Armstrong was ineligible for benefits as she had been discharged for work-related misconduct. The hearing officer determined that the evidence showed that Armstrong had been disrespectful to her manager and to a coworker (presumably Calicutt), and that she had been warned about her behavior prior to her discharge. The hearing officer stated that Armstrong "was not able to justify many of the accusations against her [but] instead she stated the accusations were lies. Her behavior and not complying with supervisors [sic] requests disregard employer's best interests."

On October 10, 2001, Armstrong filed an appeal to the Board of Review ("Board") of the decision of the Appeals Tribunal. The Board acknowledged receipt of the appeal, to which Armstrong filed a response. In her response, Armstrong did not express any objection to the fact that the Appeals Tribunal hearing had been conducted by telephone. On November 21, 2001, the Board affirmed the decision of the Appeals Tribunal, finding that the Appeals Tribunal "correctly found the facts and applied the law under Tenn. Code Ann. § 50-7-303(a)(2)." On December 28, 2001, the Board denied Armstrong's petition to rehear.[1]

On February 5, 2002, Armstrong filed this lawsuit, seeking judicial review of the Board's decision.[2] In her petition in the trial court blow, Armstrong asserted that the administrative decisions were based on inadmissible hearsay evidence, that conducting a telephone hearing under the circumstances violated her due process rights, and that her due process rights had been violated because she did not have an opportunity to see the documentary evidence used against her. On November 26, 2002, the trial court conducted a hearing on the matter. At the conclusion of the hearing, the trial court upheld the administrative decision. On December 20, 2002, the trial court entered an order consistent with its oral ruling. In its order, the trial court concluded that "the use of a telephone hearing, to which the Petitioner did not object, was not a denial of due process." From that order, Armstrong now appeals.

On appeal, Armstrong argues that her procedural due process rights were violated by the various flaws in the administrative proceedings. She identifies six ways in which her due process

---

[1]The decision of the Board of Review is the final decision of the Commissioner. *See* Tenn. Code Ann. § 50-7-304(e)(1).

[2]Armstrong is represented by Memphis Area Legal Services.

rights were violated: (1) she did not have an opportunity to review the unemployment file that was used against her; (2) some of the evidence submitted by Piccadilly was unreadable, including the pages regarding the company's policies and procedures; (3) Smith was permitted to be present during the testimony of both Armstrong and Carter, giving Piccadilly an unfair advantage; (4) Smith was permitted to be present during the reading of all of the evidence in Armstrong's administrative hearing record; (5) the hearing officer was impaired in making credibility determinations in the case because the administrative record was unusually large (30 pages) and the hearing was done by telephone; and (6) the hearing officer "glazed" through the documentary evidence without giving Armstrong sufficient opportunity to hear and understand the evidence used against her. Armstrong argues that the instructions sent by the Agency were misleading and deceptive, and that she was forced into a telephonic hearing based on unlawful procedures. Finally, Armstrong argues there is no substantial and material evidence to support a finding of work-related misconduct in this case, particularly because the hearing officer improperly relied on unreliable hearsay testimony given at the hearing to support a finding of work-related misconduct.

Our standard of review in this case is the same standard used by the trial court in reviewing the decision of an administrative agency involving a claim for unemployment benefits. ***Armstrong v. Neel***, 725 S.W.2d 953, 955 n.1 (Tenn. Ct. App. 1986). That standard is set forth in Tennessee Code Annotated § 50-7-304(i)(2) and (3):

> (2) The chancellor may affirm the decision of the board [of review] or the chancellor may reverse, remand or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
> > (A) In violation of constitutional or statutory provisions;
> > (B) In excess of the statutory authority of the agency;
> > (C) Made upon unlawful procedure;
> > (D) Arbitrary or capricious or characterized by abuse of discretion or
> clearly unwarranted exercise of discretion; or
> > (E) Unsupported by evidence which is both substantial and material
> in the light of the entire record.

> (3) In determining the substantiality of evidence, the chancellor shall take into account whatever in the record fairly detracts from its weight, but the chancellor shall not substitute the chancellor's judgment for that of the board of review as to the weight of the evidence on questions of fact. No decision of the board shall be reversed, remanded or modified by the chancellor unless for errors which affect the merits of the final decision of the board . . . .

Tenn. Code Ann. § 50-7-304(i)(2) - (3) (Supp. 2003). Thus, we must determine whether there was "substantial and material evidence" in the record to support the Agency's decision. "Substantial and material evidence" has been defined as "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under

consideration." ***Southern Ry. Co. v. State Bd. of Equalization***, 682 S.W.2d 196, 199 (Tenn. 1984). It is less than a preponderance of the evidence, but more than a scintilla. ***Wayne County v. Tennessee Solid Waste Disposal Control Bd.***, 756 S.W.2d 274, 280 (Tenn. Ct. App. 1988). Generally, an agency's factual determinations should be upheld if there exists "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." ***Id.*** (quoting ***Southern Ry.***, 682 S.W.2d at 199). Courts do not substitute their judgment for that of an agency, even if the evidence could have supported a different result. ***Id.***

We first address Armstrong's argument that her due process rights were violated by the administrative process. In the hearing before the Appeals Tribunal, Armstrong made no objection to any of the circumstances about which she now complains. "One appearing before an administrative tribunal must make timely objections to procedural errors and must raise the errors at the administrative level in order to preserve them for consideration in a petition for judicial review." ***McClellan v. Board of Regents of State University***, 921 S.W.2d 684, 690 (Tenn. 1996). The Tennessee Supreme Court has explained that issues of procedural irregularity must be raised in administrative proceedings in order to preserve them for judicial review:

> Judicial review of an agency decision is confined to the administrative record, except in limited circumstances. ***Metropolitan Gov't v. Shacklett***, 554 S.W.2d 601 (Tenn. 1977). It follows that it is no less incumbent for a party to an administrative proceeding to raise issues of procedural irregularity than it is for a party in a judicial proceeding. The administrative tribunal, like the trial court, must be given the opportunity to correct procedural errors. Allowing parties to acquiesce in the procedures, but to challenge those same procedures on appeal is inefficient and unreasonable. Had [the plaintiff] complained of the procedure initially, or even in his Petition for Appeal of the Initial Order, the procedures could have been clarified or even modified. He did not raise the issue until long after it could have been explored and, if necessary, rectified. He cannot be heard to complain at this late date.

***Id.*** (footnotes omitted). Though Armstrong represented herself in the administrative tribunal, she had no less obligation to raise her objections in that forum in order to preserve the issues for appeal.

Even if Armstrong had objected to the issues raised in this appeal, we would conclude that her due process rights were not violated. ***See Simmons v. Traughber***, 791 S.W.2d 21, 24 (Tenn. 1990) (recognizing that a litigant is entitled to a fair hearing in the administrative tribunal). Armstrong claims that she was "forced" into having a telephonic hearing, and that she did not have an opportunity to have her appeal heard in person. This assertion is simply not borne out by the evidence. Armstrong first had an opportunity to choose an in-person hearing by checking the appropriate box on her application for appeal; she failed to do so. Later, in the notice of the telephone hearing that was sent to Armstrong by the Agency, it was prominently stated that she could contact the Appeals Tribunal "immediately" if she wished an in-person hearing. In response to this notice, Armstrong requested to change the date of the telephone hearing, but apparently took no steps

to secure an in-person hearing before the actual telephonic hearing date. Finally, at the outset of the telephone hearing, when Armstrong asked the hearing officer in the Appeals Tribunal why the hearing was not in person, she was told that she did not properly elect to have an in-person hearing. Armstrong responded, "I did that, but anyway, okay." Armstrong argues that, at that point, the hearing officer should have known that Armstrong was confused and had the duty to reschedule Armstrong for an in-person hearing. We disagree. Armstrong's response indicated her acquiescence in having the hearing by telephone, as originally scheduled and as explained in the notice sent to her. Under these circumstances, we cannot conclude that Armstrong was unfairly denied the opportunity to have an in-person hearing.

Armstrong also argues that her due process rights were violated because the hearing officer was "impaired in making a credibility determination in the case in the fact that the administrative record was so large (i.e. 30 pages) and the hearing was being done by telephone." Armstrong also claims that her due process rights were violated because she did not get a copy of her personnel file, which was used against her in the hearing, despite the fact that the telephonic hearing instructions provided that documents offered as evidence should be "sent to the other party, if time allows." In response, the Agency concedes that Armstrong perhaps should have been given a copy of the documents submitted to the hearing officer. The Agency asserts, however, that the failure to do so was a minor breakdown in procedure and should not be considered to be a violation of due process. The Agency also notes that the information in the documentary evidence was corroborated by the testimony of Carter and Smith, and that Armstrong had an opportunity to question those witnesses at the hearing.

Again, it must be noted that Armstrong made no objection to the hearing officer's consideration of the documents submitted by Piccadilly, nor did she request that a copy of those documents be sent to her. Armstrong was given the opportunity to ask questions about the documents or seek clarification of their contents. She did not do so. Under these circumstances, even if the issue had been preserved for appeal, Armstrong's due process rights were not violated on this basis.[3]

Armstrong also claims that her due process rights were violated because Smith was allowed to be present during the other witnesses' testimony and during the review of the documentary evidence. Armstrong does not explain why Smith's presence during the other testimony caused her administrative hearing to be unfair, and once again, Armstrong did not object to Smith's presence during the hearing. This argument is without merit.

Next, Armstrong contends that there was no substantial and material evidence to support the Agency's denial of unemployment benefits. First, she claims that much of the evidence submitted

---

[3]Armstrong argues that she did not have an opportunity to submit documentary evidence, because she did not realize that her hearing would be by telephone. This argument is without merit. The undisputed evidence in the record shows that Armstrong was not only aware that the hearing would be telephonic, but she took steps to change the date of the telephonic hearing based on personal circumstances. Furthermore, Armstrong was clearly notified in the instructions that she had the opportunity to submit documentary evidence.

to the Appeals Tribunal constituted hearsay, and that the hearing officers' reliance on that evidence was improper.  Second, she asserts that the evidence did not establish the that she had engaged in work-related misconduct sufficient to justify her disqualification from receiving unemployment benefits.  Each of these issues will be addressed in turn.

Regarding her hearsay argument, Armstrong acknowledges that the Tennessee Rules of Evidence do not apply to administrative hearings, and that hearsay evidence is admissible in such proceedings.  *See Roberts v. Traughber*, 844 S.W.2d 192, 198 (Tenn. Ct. App. 1991).  She argues, however, that the evidence must nevertheless be reliable in order to be considered probative.  Section 4-5-313(1) of the Tennessee Code Annotated provides:

> [An] agency shall admit and give probative effect to evidence admissible in a court, and when necessary to ascertain facts not reasonably susceptible to proof under the rules of court, evidence not admissible thereunder may be admitted if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs.

Tenn. Code Ann. § 4-5-313(1) (1998).  Thus, hearsay evidence may be admitted if it is the type that is commonly relied upon by a reasonable person.

In this case, the hearsay evidence to which Armstrong objects involved statements contained in the documentary evidence.  For example, Armstrong's personnel file contained statements written by Carter recounting complaints by other employees about Armstrong.  Carter's written statements included things said by the interviewed employees about Armstrong.  Another document indicated that Calicutt filed a harassment charge against Armstrong, but Calicutt was unavailable for questioning during the telephonic hearing.  Armstrong argues that such evidence was inadmissible because it is not reliable, and that it cannot support a finding of work-related misconduct.  Once again, Armstrong made no objection to the evidence admitted during the telephonic hearing.  Rather, Armstrong testified solely on her own behalf and was given the opportunity to question the other witnesses and challenge the reliability of their statements.  This argument is without merit.

Finally, Armstrong argues that the evidence was insufficient to show that she had engaged in work-related misconduct sufficient to disqualify her from receiving unemployment benefits under Tennessee Code Annotated § 50-7-303(a)(2).  That statute provides that a claimant is disqualified from receiving unemployment benefits if the Agency finds that the claimant has been discharged "for misconduct connected with such claimant's work . . . ."  Tenn. Code Ann. § 50-7-303(a)(2).  The type of misconduct required is not defined in the statute.  Armstrong argues that the statute requires the employer to show some material breach of duty by the employee, and that such a breach must be willful and wanton in order to be disqualified from receiving benefits under the statute.  Because she did not engage in wilful and malicious misconduct, she argues, the evidence does not support the denial of benefits.

In ***Armstrong v. Neel***, 725 S.W.2d 253 (Tenn. Ct. App. 1986), the court discussed the type of misconduct that would constitute "misconduct connected with . . . work" under the statute. The court adopted the standard applied by an oft-cited Wisconsin Supreme Court case:

> [Misconduct connected with employment is] conduct evincing such wilful and wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertences or ordinary negligence in isolated instances, or good faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute.

***Boynton Cab Co. v. Neubeck***, 237 Wis. 249, 296 N.W. 636, 640 (1941). Thus, under this standard, the employee's misconduct must at least constitute intentional and deliberate disregard for the standards of the employer. An employee cannot be disqualified from receiving benefits if his misconduct can be deemed to be merely negligent, careless, or inefficient. ***Armstrong***, 725 S.W.2d at 956; *see also* Shauna Cully Wagner, J.D., Annotation, *Work-Related Inefficiency, Incompetence, or Negligence as "Misconduct" Barring Unemployment Compensation*, 95 A.L.R.5th 329 (2002).

In this case, the hearing officer made the following conclusions of law based on her findings of fact from the hearing:

> Misconduct is an intentional act or a violation of policy that breaches the standards of behavior an employer has a right to expect. Claimants are eligible for unemployment when they have been separated due to no fault of their own. In this case, the claimant was disrespectful to her manager and a coworker. There were occasions she did not follow instructions and she was warned about her behavior. The Appeals Tribunal finds the evidence was based primarily on the he said she said but the employer's testimony was found to be more credible. . . . Her behavior and not complying with supervisors [sic] requests disregard employer's best interests.

Thus, the hearing officer determined that Armstrong intentionally did not comply with her supervisor's requests and disregarded her employer's best interests.

Even without considering the documentary evidence or the hearsay to which Armstrong objects, we find that the hearing officer's conclusion was clearly supported by substantial and material evidence. There was overwhelming testimony that Armstrong engaged in a persistent pattern of belligerent and hostile behavior. Piccadilly was not required to continue to put up with this conduct. The hearing officer's opinion correctly states the law, and the hearing officer properly

applied the law to the facts in concluding that Armstrong engaged in work-related misconduct sufficient to disqualify her from receiving unemployment benefits.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Quinton Armstrong, and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE