IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 24, 2012 Session

## LEON MARSHALL v. CIVIL SERVICE COMMISSION OF THE STATE OF TENNESSEE AND THE TENNESSEE DEPARTMENT OF SAFETY

Appeal from the Chancery Court for Davidson County
No. 10199II    Carol L. McCoy, Chancellor

No. M2011-02157-COA-R3-CV - Filed November 9, 2012

Pursuant to Tennessee Code Annotated section 4-5-322, a former Tennessee State Trooper appeals the chancery court's judgment affirming the Tennessee Civil Service Commission's decision to terminate his employment. The Commission affirmed the initial order of the Administrative Law Judge, who upheld the Tennessee Department of Safety's decision to terminate the trooper's employment for violations of its policies and procedures and for the good of the service pursuant to Tennessee Code Annotated section 8-30-326.[1] Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Patrick Brocklin Parks, Nashville, Tennessee, for the appellant, Leon Terry Marshall.

Robert E. Cooper, Jr., Attorney General and Reporter; William E. Young, Solicitor General; and Eugenie B. Whitesell; for the appellees, Civil Service Commission of the State of Tennessee and the Tennessee Department of Safety.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

Leon Marshall ("Mr. Marshall"), a former Kingsport Police Department officer, began

---

[1] Tenn. Code Ann. § 8-30-326 was repealed as of October 1, 2012 by 2012 Tenn. Pub. Acts ch. 800 § 41. The repeal has no effect on this case.

working for the Tennessee Highway Patrol ("THP") on January 28, 2007. He graduated from the THP Academy on June 1, 2007, was assigned to THP District 5 in Fall Branch, completed an eight-week field training under Sergeant Kristy Osborne, and was finally assigned to serve as a road trooper on the Hawkins County highways. Mr. Marshall's immediate supervisor was Sergeant Mark Higgs, followed by Lieutenant Charles Hughes and Captain Richard Hurley.

Several instances of erroneous decision-making during Mr. Marshall's brief stint with the THP led to his ultimate termination. In September 2007, in acting on a citizen's complaint, Mr. Marshall abandoned his patrol route and traversed two counties to personally serve a warrant for alleged theft. The complaint proved to be false, and the warrant was dismissed. Mr. Marshall's proferred reason for serving a warrant two counties away was that he was a "state law enforcement officer." Mr. Marshall received a written reprimand and warning instructing him that "turning the complaint over to the Sullivan County Sheriff's Department or the police department who received the call" should have been the proper action, and reminding him that:

> [t]he Department of Safety [("DOS")] General Order #215-2, Section V, Subsection D(1) states: "All members are required to be at their assigned duty station when the scheduled shift begins and are not permitted to leave the assigned duty station until the shift ends."

In November 2007, Captain Hurley issued Mr. Marshall an oral reprimand for chasing an all-terrain vehicle into a lake bottom upon observing that the vehicle did not have its lights on. In his pursuit, Mr. Marshall caused over $350 of damage to the police cruiser. He then insisted upon meeting with Captain Hurley to challenge the oral warning, though doing so was outside of protocol. Captain Hurley testified that, during the meeting, he explained to Mr. Marshall how his actions could have compromised his own safety, yet Mr. Marshall was loath to admit fault, and insisted that he was simply enforcing the law and, in parting, told Captain Hurley, "well, you just gotta do what you have to do, don't you Captain?".

In December 2007, while Mr. Marshall was hunting in Virginia, a property owner confronted him and accused him of trespassing. The two men argued, each protesting the other's right to be on the property. At one point, Mr. Marshall proclaimed, "Listen, just because I'm wearing hunting gear, hunting clothing, don't talk to me like I'm a dumbass. I'm a Tennessee State Trooper, so don't you talk to me that way . . . Well, I can guaran-damn-tee you that I will not be back up here again." Later, after the property owner filed a complaint with the DOS, Mr. Marshall could not articulate a valid reason for identifying himself as a Tennessee State Trooper during the dispute. When discussing the incident with Captain Hurley, he offered neither remorse nor apology. Because of his statements to the

property owner, Mr. Marshall received a written warning reminding him that the DOS Law Enforcement Code of Ethics compelled him to "keep [his] private life unsullied as an example to all."

In March 2008, Mr. Marshall crashed his assigned cruiser again, this time because he rear-ended a car while trying to catch a speeding driver. The resulting injuries to everyone involved and an estimated $8,803.72 of damage to the patrol car earned Mr. Marshall a two-day unpaid suspension for reckless operation of the patrol car, among other violations.

*The Fugate Episodes*

The THP's authority is broad in scope, but its primary focus is matters relating to highways and interstates. Generally, THP troopers do not infringe upon a city's or county's jurisdiction, though the THP's jurisdiction overlaps that of local law enforcement agencies.[2] Mr. Marshall's most egregious violations of his employer's rules and regulations–which prompted the DOS Office of Professional Responsibility's investigation into his conduct–took place in Rogersville, Tennessee, away from the highways and interstates he was entrusted to patrol.

By December 2007, Mr. Marshall had become acquainted with Rhonda Elkins ("Ms. Elkins"), the manager of the Rogersville BP gas station where he habitually refueled his cruiser. Ms. Elkins told Mr. Marshall that a customer, Anthony Fugate ("Mr. Fugate"), was a general nuisance and that she was greatly concerned for her own safety and the safety of her employees, so Mr. Marshall correctly referred her to the Rogersville Police Department, noting that a police report could support a criminal summons on Mr. Fugate for trespassing.

On December 31, 2007, Ms. Elkins informed Mr. Marshall that she could not obtain a summons from the Hawkins County general sessions court because the Rogersville police officers whom she contacted completed only complaint cards, not a police report, about her allegations against Mr. Fugate. Mr. Marshall took the complaint cards from Ms. Elkins and proceeded to find Mr. Fugate by going to the address linked to his driver's license information (his mother's address), speaking with Mr. Fugate's mother, and driving to Mr. Fugate's actual address. Mr. Marshall explained that "there wasn't much going on as far as Highway Patrol duties on that day" and that he "thought it wouldn't take but a few minutes out of [his] day to stop and speak with Mr. Fugate." Using the police cruiser video camera, Mr. Marshall documented the encounters with Mr. Fugate and his mother. Mr. Marshall told

---

[2] Captain Hurley and Lieutenant Hughes testified as to this policy. Lieutenant Hughes, for example, noted, "[THP troopers] enforce the laws of the road. We investigate crashes . . . . [W]e have never been trained as State Police as far as getting involved in enforcing laws, investigating crime."

Mr. Fugate that he was banished from the BP Station, but did not charge him with a crime or arrest him because it "wasn't [his] job to do that." Then, based on Ms. Elkins's allegations and the conversation with Mr. Fugate, Mr. Marshall completed a THP Offense Report against Mr. Fugate, and, in violation of THP procedure, gave a copy to Ms. Elkins before submitting it to his supervisor for review and signature.[3] Mr. Marshall "advised [Ms. Elkins] that she could handle the matter as she saw fit" and that "if she wanted to go get a summons on Mr. Fugate for trespassing she could do that."[4]

On January 14, 2008, Ms. Elkins informed Mr. Marshall that, though Mr. Fugate had avoided coming onto the actual BP property, he had twice frightened her by revving his car engine from nearby areas–once from the center turn lane in front of the BP and the second time from an adjacent parking lot. Ms. Elkins "didn't ask [Mr. Marshall], necessarily, to do anything," but he decided to return to Mr. Fugate's home, though he "didn't go to Mr. Fugate's residence with any inclination that [he] was gonna arrest him and take him to jail, or what [he] would charge him with."

Upon arrival at Mr. Fugate's home, Mr. Marshall was uniformed and armed, but he neither manually activated the police cruiser's video camera or audio tape, nor used his belt transmitter to activate those devices. Mr. Fugate answered Mr. Marshall's knock and stepped out of the house. Mr. Marshall explained that, because Mr. Fugate "had a swagger about him, and an appearance in his face" and because Mr. Fugate was wearing a jacket, he felt that Mr. Fugate was possibly intoxicated and armed. Based on his observations and Ms. Elkins's allegations, he thought that probable cause existed to arrest Mr. Fugate for aggravated stalking.[5] Therefore, Mr. Marshall frisked and handcuffed Mr. Fugate, took him into custody for aggravated stalking, placed him in the backseat of the police cruiser, Mirandized him, and interviewed him. At some point during the interview, Mr. Marshall determined that Mr. Fugate was mentally ill[6] and began to question his culpability, so he released him. Mr. Marshall advised Ms. Elkins that Mr. Fugate would likely stop bothering her and "recommended to her that she still get a trespassing warrant on him if she so chose to do so."

_____

[3] Mr. Marshall testified, "at that point in time I completed a [THP] Offense Report, and probably not the best judgment at the time, but I did it in the sense and the spirit of public safety." He later submitted the report to his supervisor who signed it on January 6, 2008.

[4] Ms. Elkins chose not to do so.

[5] Tenn. Code Ann. § 39-17-315(c)(1).

[6] This determination was based on Mr. Fugate's demeanor and on information Mr. Marshall "had heard from other officers who work in the county and the city that Mr. Fugate was possibly mentally ill." Mr. Fugate has suffered three heart attacks and is diagnosed with diabetes and bi-polar disorder.

-4-

Ms. Elkins ultimately did not prosecute Mr. Fugate.

Despite his presentiment that Mr. Fugate would file a complaint against him, Mr. Marshall neither completed a report nor bothered to tell anyone, save Ms. Elkins, about the January 14, 2008 incident. He "figured if Mr. Fugate had called [the THP] and complained that it would be clarified at that point in time, and we could handle it at that point." Mr. Fugate complained to the THP and filed a lawsuit against the DOS because of Mr. Marshall's conduct.

After receiving Mr. Fugate's complaint, Sergeant Higgs and Lieutenant Hughes interviewed Mr. Marshall on January 31, 2008; Lieutenant Hughes and Captain Hurley interviewed him on March 3, 2008; and Captain Hurley again met with him on March 7, 2008. In defending his involvement in the matter between Mr. Fugate and Ms. Elkins–one that was outside the THP's purview–Mr. Marshall expressed that he "tr[ies] to do the best job that [he] can to help people" and would not accept that he had broken any of his employer's rules and procedures, had not followed his training, and had possibly violated Mr. Fugate's constitutional rights. During the March 7, 2008 meeting, Mr. Marshall presented Captain Hurley with a North Carolina case regarding the concept of "field unarrest," claiming that it provided legal support for his actions against Mr. Fugate. Mr. Marshall claimed that Assistant District Attorney Doug Godbee gave him the case and advised him that the manner in which he arrested and thereafter released Mr. Fugate was legal and proper. General Godbee, however, testified to the contrary.[7]

On March 21, 2008, the DOS Criminal Investigation Division[8] Special Agent in Charge, Billy Grooms, Assistant Special Agent in Charge David Brown, and DOS Internal Affairs Sergeant Lowell Russell interviewed Mr. Marshall about the Fugate episodes. Mr. Marshall was placed on administrative leave on that same day. Agents Grooms and Brown conducted a criminal investigation, and Sergeant Russell investigated Mr. Marshall for

---

[7] Q. Okay, and did Trooper Marshall at some point–and I want you to tell us when, at some point were you contacted by Trooper Marshall concerning some contact he had with a Mr. Anthony Fugate?
A. Was I con–yeah, I don't know when it was. It was at Sessions Court, outside of Sessions Court one day.
Q. Okay, and pursuant to that conversation, did you make some reference to Mr. Marshall that a–that there was something called a field unarrest?
A. No. I don't know what a field unarrest is.
Q. Okay, and at that–during that particular conversation did you give him a case *State v. Green* out of North Carolina as support for this doctrine of field unarrest?
A. No. I've never heard of that case until sometime, somebody later faxed us a copy of a case to our office. But no, I wouldn't give him that case, because I'd never heard of it.

[8] The Criminal Investigation Division is within the DOS's Office of Professional Responsibility.

violations of departmental policies. The Office of Professional Responsibility, in addition, investigated the other incidents in which Mr. Marshall had been involved since September 2007,[9] and the final investigatory report was completed on April 17, 2008. Based upon the report's findings and their own interviews with Mr. Marshall, all of his superiors recommended his termination.[10] Mr. Marshall received a due process notice of termination on April 25, 2008 and a May 29, 2008 letter in which DOS Commissioner Dave Mitchell notified him that the DOS was terminating his position as THP Trooper "for the good of the service" and for reasons "more specifically described in the attached summary of the investigation which was conducted and prepared by the Office of Professional Responsibility unit."

Mr. Marshall exhausted all administrative levels of appeal and sought a hearing before the Tennessee Civil Service Commission ("the Commission"). Administrative Law Judge ("ALJ") Mattielyn Williams, sitting for the Commission, conducted the hearing on May 5, 2009. The Commission affirmed the DOS's decision to terminate Mr. Marshall by amended initial order entered December 7, 2009. The order was made final by the Commission on December 22, 2009. Mr. Marshall then filed a petition for judicial review with the chancery court, pursuant to Tenn. Code Ann. § 4-5-322. After review of the entire administrative record, the chancery court found "substantial and material evidence in the record to support the decision to terminate Mr. Marshall for the good of the service," dismissed the petition for review, and affirmed the Commission's decision by memorandum and order entered August 31, 2011.

ISSUES PRESENTED

Mr. Marshall raises for review two issues which we restate as follows:

---

[9] *See supra.*

[10] [To Captain Hurley]
Q. And are you the one who made the recommendation?
A. Yes.
Q. And what was your recommendation?
A. After the Fugate situation, was to be terminated from the Department of Safety.
Q. And why?
A. Oh, the magnitude of it first of all. Just the magnitude of what happened, and the violation of, in my opinion, this man's rights, his Constitutional Rights . . . And that with–coupled with all these other things that has happened in a short period of time, I just thought he was a liability for the State.
Q. Okay. When you say a liability, tell us how a Trooper who does things like Mr. Marshall is a liability to the State?
A. Well, I mean, if you mistreat people out here they have a right of recourse. And whatever recourse they take, it's a direct reflection on our Department, the State . . . .

-6-

(1) Whether the chancery court properly applied the requirements for judicial review of administrative decisions; and (2) Whether Mr. Marshall's termination from the DOS violates the standards set forth in Tenn. Code Ann. § 4-5-322(h). We have determined the dispositive issue to be whether substantial and material evidence in the record supports the Commission's finding that the DOS properly terminated Mr. Marshall.

STANDARD OF REVIEW

Pursuant to Tenn. Code Ann. § 4-5-322, the trial court may review "contested case" proceedings that come before state administrative agencies. A party may appeal from the chancery court's final judgment to this Court. Tenn. Code Ann. § 4-5-323(a). The Uniform Administrative Procedures Act ("UAPA"), Tenn. Code Ann. § 4-5-101 *et seq.*, limits our scope of review of the agency decision to a "narrow and statutorily prescribed review of the record made before the administrative agency." *Crawford v. Dep't of Fin. & Admin.*, No. M2011-01467-COA-R3-CV, 2012 WL 219327, at *5 (Tenn. Ct. App. Jan. 24, 2012) (no Tenn. R. App. P. 11 application filed) (quoting *Metro. Gov't v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977)). The UAPA's narrow standard of review for an administrative body's factual determinations "suggests that, unlike other civil appeals, the courts should be less confident that their judgment is preferable to that of the agency." *Wayne Cnty. v. Tenn. Solid Waste Disposal Control Bd.,* 756 S.W.2d 274, 279 (Tenn. Ct. App. 1988).

The review pursuant to the UAPA is not de novo, but is confined to the record made before the agency. Tenn. Code Ann. § 4-5-322(g); *Shacklett*, 554 S.W.2d at 604. This Court may reverse or modify the agency's decision only if it is:

> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5)(A) Unsupported by evidence that is both substantial and material in the light of the entire record.

Tenn. Code Ann. § 4-5-322(h). Furthermore, "[n]o agency decision pursuant to a hearing in a contested case shall be reversed . . . unless for errors that affect the merits of such decision." Tenn. Code Ann. § 4-5-322(i). Additionally, "a concurrent finding between the

agency and the trial court on any issue of fact is conclusive upon this Court" and "[u]nless there is a plain abuse of discretion by the Commission, its orders will not be disturbed on appeal." *CF Indus. v. Tenn. Pub. Serv. Comm'n*, 599 S.W.2d 536, 540 (Tenn. 1980) (quoting *Blue Ridge Transp. Co. v. Hammer*, 313 S.W.2d 433, 436 (Tenn. 1958)).

In the present case, Mr. Marshall must prove that, in light of the whole record, the Commission's decision is not supported by substantial and material evidence, that is, "such relevant evidence as a reasonable mind might accept to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Wayne Cnty*. 756 S.W.2d at 279-80 (quoting *S. Ry. v. State Bd. of Equalization,* 682 S.W.2d 196, 199 (Tenn. 1984)). Substantial evidence "requires something less than a preponderance of the evidence . . . but more than a scintilla or glimmer." *Id*. at 280 (citations omitted).

ANALYSIS

I. Chancery Court's Review

Mr. Marshall asserts that the chancery court failed to properly apply the standard of review set forth in Tenn. Code Ann. § 4-5-322 because "there is no analysis . . . of the substantial legal implications of the January 14th encounter." Misstating the issue, he argues that, in their respective orders, the Commission and the chancery court should have analyzed "issues involving criminal law, probable cause analysis, prosecutorial discretion, allegations of official misconduct and oppression, civil rights issues, etc." He further argues that, because his pursuit, arrest, and release of Mr. Fugate were proper under criminal law, the Commission and the chancery court erred in upholding the DOS's decision to terminate his employment. We disagree.

The DOS terminated Mr. Marshall for the good of the service and because of several incidents, including the Fugate incident, during which he violated his employer's policies and regulations. Assuming *arguendo* that Mr. Marshall's actions against Mr. Fugate were defensible under our criminal law, the ALJ's findings constitute ample grounds for discipline. These findings, which the record substantially and materially supports, include determinations that Mr. Marshall infringed on the Rogersville Police Department's jurisdiction, that during his brief stint with the THP he repeatedly demonstrated incompetence and a lack of knowledge of DOS practices, that he ignored DOS practices based on his own sense of right and wrong, and that he violated several DOS policies and general orders.

Furthermore, Mr. Marshall's contention that the chancery court's "obligation was to review the facts de novo as they relate to the ALJ's application of law" is simply incorrect.

The chancery court's review of an agency's decision is the same as our review: narrow, statutorily prescribed, and confined to the administrative record. Tenn. Code Ann. § 4-5-322(g); *see Shacklett*, 554 S.W.2d at 604; *Grubb v. Tenn. Civil Serv. Comm'n*, 731 S.W.2d 919, 922 (Tenn. Ct. App. 1987) ("The Court may not review issues of fact *de novo* or substitute the judgment of the Court for that of the agency as to the weight of the evidence."). We find that the chancery court thoroughly and properly reviewed the Commission's decision and, for reasons set forth below, affirm the same.

## II. Substantial and Material Evidence

Although Mr. Marshall does not state the statutory ground(s) upon which he seeks reversal pursuant to Tenn. Code Ann. § 4-5-322(h), we infer that he challenges the evidence supporting the Commission's decision. Tenn. Code Ann. § 4-5-322(h)(5). Based upon our thorough review of the evidence presented at the May 5, 2009 hearing, we find that the DOS had sufficient grounds upon which to terminate Mr. Marshall. The ALJ's conclusions include the following:

> [In reference to Mr. Marshall's September 2007 abandonment of his patrol route to personally serve a warrant for alleged theft]: A. When [Mr. Marshall] failed to investigate the complainant, that he learned about while accompanying a KPD officer, prior to obtaining and serving the warrant, [Mr. Marshall] demonstrated incompetence and negligence, in violation of DHR Rules 1120-10-.06(1) and (2).[11] [Mr. Marshall] also demonstrated inefficiency through that scenario, since [Mr. Marshall's] failure to conduct a proper investigation led to [Mr. Marshall] having to later have the warrant and case dismissed, constituting violation of DHR Rule 1120-10-.06(1).
> . . .
>
> D. When [Mr. Marshall] failed to complete an Incident Report and failed to utilize the video tape and audio taping capability's [sic] of his cruiser, on January 14th, [Mr. Marshall] demonstrated negligence, in violation of DHR Rule 1120-10-.06(2).
>
> E. When [Mr. Marshall] inserted himself into matters for which R[ogersville] P[olice] D[epartment] had primary jurisdiction, [Mr. Marshall] demonstrated a lack of knowledge of the proper role of THP Troopers, in violation of DHR

---

[11] Tennessee Department of Human Resources ("DHR") Rule 1120-10-.06(1) provides that inefficiency or incompetency in the performance of duties is cause for disciplinary action. DHR Rule 1120-10-.06(2) provides that negligence in the performance of duties is cause for disciplinary action.

Rule 1120-10-.06(2), negligence.

F. When [Mr. Marshall] engaged in the behavior of arresting and "un-arresting" Mr. Fugate, [Mr. Marshall] demonstrated incompetence and a lack of knowledge OR lack of willingness to adhere to THP practices and to lawful conduct, in violation of DHR Rules 1120-10-.06(1) and (2), and in violation of Department of Safety General Order 300, II.[12]
. . .

H. When [Mr. Marshall] refused to follow directions from veteran Troopers and Supervisors Hurley and Hughes, [Mr. Marshall] demonstrated a lack of regard for the chain of command and authority of those Supervisors . . . .

I. Since [Mr. Marshall's] incidences have occurred so closely together and were accompanied by an unwillingness to follow established THP protocol, and since [Mr. Marshall's] conduct in arresting Mr. Fugate at his home, without a warrant, and in "un-arresting" him risked legal liability for the D[OS] and may have violated Mr. Fugate's constitutional rights, [Mr. Marshall's] conduct falls within DHR Rule 1120-10-.06(8), gross misconduct or conduct unbecoming an employee in State service. When such conduct occurs, it is permissible to terminate that employee for the good of the service, as outlined in T.C.A. 8-30-326 and DHR Rule 1120-10-.06(24).

J. Gross misconduct includes job-related conduct that may subject an employee to criminal prosecution. [Mr. Marshall's] conduct, i.e., in arresting Mr. Fugate, could well have resulted in criminal prosecution under T.C.A. 39-16-402 Official Misconduct or T.C.A. 39-16-403: Official Oppression. Thus, [Mr. Marshall's] January 14th behavior constitutes gross misconduct.

K. When [Mr. Marshall] took it upon himself to travel two (2) counties over to serve a warrant, [Mr. Marshall] did not judiciously use his authority. When [Mr. Marshall] met with Mr. Fugate on December 31st, then arrested and "un-arrested" him on January 14th, [Mr. Marshall] did not judiciously use his authority. These two (2) incidents constitute violation of Department of Safety

---

[12] This general order provides , in part, that the DOS requires "members assigned to patrol duties and functions to effectively patrol the *highways* of the State of Tennessee, to execute all *traffic related* responsibilities and services . . . . All decisions or actions by members must be supported by case law, statutory law and knowledge of the particular law being applied." (Emphasis added).

General Order 102, III, B.[13]

L. When [Mr. Marshall] met with Mr. Fugate on December 31st, then arrested and "unarrested" him on January 14th, [Mr. Marshall] abused his authority, a violation of Department of Safety General Order 216-2, IV, 4, i.e., mistreatment of the general public, oppression, injustice, willful maltreatment of a person.

M. Similarly, when [Mr. Marshall] identified himself as a Tennessee State Trooper, during the out-of-state hunting incident, [Mr. Marshall] abused his authority . . . [and] fail[ed] to use his authority judiciously.

N. When [Mr. Marshall] drove into an area two (2) counties away from his assigned patrol route, without authorization from his Supervisor, and when [Mr. Marshall] failed to submit a written Incident Report regarding his January 14th interaction with Mr. Fugate, [Mr. Marshall] engaged in neglect of duty, in violation of Department of Safety General Order 216-2, IV, 14[14] and in negligence, in violation of Department of Safety Order 102, III, B.

R. When [Mr. Marshall] failed to write a written report/Incident Report, and failed to inform his Supervisors of the January 14th incident with Mr. Fugate, even though [Mr. Marshall] himself admits that he knew a complaint was likely, [Mr. Marshall] violated Department of Safety General Order 525, II[15] . . . and engaged in neglect of duty, in violation of Department of Safety General Order 216-2, IV, 14.

S. . . . When [Mr. Marshall] failed to self-report his January 14th conduct, even when he knew a complaint was likely, [Mr. Marshall] demonstrated a callous disregard for the chain of command, his responsibility to his Supervisors, and the need for the THP to prepare to protect its public image. THP is an organization in which the chain of command and willingness to follow Orders

---

[13] This general order provides that employees shall be held accountable for the judicious use of delegated authority and that such use should follow the law and DOS rules and regulations.

[14] Neglect of duty includes "failure to submit written or verbal reports when required or duty demands at the designated time." DOS General Order 216-2, IV, 14, d.

[15] The general order provides that all employees shall record and report all occurrences that directly involve themselves or departmental property that may lead to complaints, civil litigation, criminal prosecution, or embarrassment to themselves or the department.

is key.

T. When [Mr. Marshall] failed to have a Supervisor review and sign off on the Incident Report that he provided Ms. Elkins, [Mr. Marshall] violated Department of Safety General Order 525, II, VI, and VII.[16]

U. When [Mr. Marshall] failed to activate the video and audio equipment that he had been provided for encounters with citizens, when he contacted and had the incident with Mr. Fugate on January 14th, [Mr. Marshall] violated Department of Safety General Order 712, Sections I, II, V, and D.[17]
. . .

AA. [Mr. Marshall's] conduct in failing to file Incident Reports, in providing Incident Reports to citizens that have not been reviewed and signed off on by Supervisors, when [Mr. Marshall] admits that he knew and understood what was required by the THP but thought that he was serving a higher good, constitutes negligence and incompetence, in violation of DHR Rule 1120-10-.06(1) and (2), as well as Department of Safety General Order 525, VII.

BB. Such conduct clearly assumes that [Mr. Marshall], with less than one (1) year of service with the THP, knows the law, protocol, and proper conduct better than Supervisors with over thirty (30) years of experience, and better than the written policies and General Orders of the THP, based on law and experience . . . .

CC. Overall, [Mr. Marshall] has shown contempt and lack of respect for the Highway Patrol's practices and procedures, as set forth in its General Orders.

---

[16] DOS General Order 525 VI, B instructs that an offense report is required for an "event [that] relates to occurrences involving offenses committed against or occurring to citizens and/or their property caused by persons other than departmental members" and "any offenses or occurrences other than traffic crashes." Section VII provides in part that "[t]he Incident/Offense Report shall be completed and forwarded to the supervisor for review."

[17] We believe the ALJ intended to reference DOS General Orders 712-1, II and 712-1, V, D which provide that DOS policy requires "members assigned audio/video recording equipment to utilize the equipment for the purpose of collecting accurate accounts of events as they occur. Such events include . . . arrests . . . and other contacts with citizens" and "[m]embers should operate the MVS with the remote function on [so as to] immediately activate audio/video while outside the vehicle in the event a situation arises while the member is outside the vehicle."

We agree with the chancery court that the ALJ's decision regarding grounds for discipline was more than amply supported by substantial and material evidence.

Having found that substantial and material evidence supports the ALJ's findings that Mr. Marshall violated several of his employer's rules and policies, we now consider whether these violations justify his dismissal from the THP. The ALJ and the chancery court found that Mr. Marshall's personal sense of right and wrong, rather than his training, general protocol, and the DOS General Orders, policies, and practices, guided his actions. The record, particularly Mr. Marshall's own testimony, amply supports this finding. He repeatedly excuses the actions for which he was disciplined by referring to "good faith," "put[ting] on a uniform and go[ing] out every day to try to help people," "the spirit of public safety," and "the feelings of morality that [he] has in terms of law enforcement." In discussing the incidents that led to his ultimate dismissal, Mr. Marshall failed to show an understanding that his conduct was unacceptable, telling his supervisors that "there's no point in my doing the job anymore if I'm not here trying to help people."

Mr. Marshall takes issue with the degree of discipline imposed upon him. His attitude demonstrates an unwillingness to conform to his employer's rules and, as the ALJ and chancery court found, factored into the DOS's choice of discipline in his case. The ALJ concluded that Mr. Marshall's "is one of those rare cases in which it is simply not reasonable to expect the THP to accept [Mr. Marshall] back as a THP Officer, even after a lengthy suspension, because [he] has so quickly demonstrated through behavior as well as words so thoroughly that he neither trusts, respects, or nor [sic] seeks to protect his Employer, its reputation, and its management/Supervisory staff." We note that "[i]f a government employer has a choice of sanctions available for the violation of an employment rule, it would only be a finding of arbitrariness that would allow a court to 'second guess' the administrative decision maker." *Lien v. Metro. Gov't of Nashville,* 117 S.W.3d 753, 761 (Tenn. Ct. App. 2003). Regarding the choice of sanctions applied in this case, we are not inclined to substitute our judgment for that of the Commission.

Finally, considering Mr. Marshall's actions as a whole, and the fact that his infractions were broad in range and occurred closely in time, the ALJ concluded, and the chancery court affirmed, that terminating Mr. Marshall was for the good of the service. Pursuant to Tenn. Code Ann. § 8-30-326, an appointing authority may "dismiss any employee in the authority's division when the authority considers that the good of the service will be served thereby." We agree with the chancery court and with the ALJ that Mr. Marshall seriously impaired his own usefulness as a THP Trooper and that his failure and unwillingness to conform to the essential THP Trooper job requirements warrant his termination for the good of the service.

CONCLUSION

For the foregoing reasons, we affirm the chancery court's order. Costs of appeal are assessed against the appellant, Leon Marshall, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE